SIGURBJORN GUDMUNDSON, Johann S. Gestson, Johann Sigurdson, Sigurjon Gestson, and Sigurgeir Bjornson, as Trustees of Thingvalla Congregation of Pembina County, North Dakota, and Other Members of said Congregation having a Common Interest, v. THINGVALLA LUTHERAN CHURCH, a Religious Corporation of Pembina County, North Dakota, and Magnus Benjaminson, Olafur Olafson, K. G. Kristjanson, Christian Geir, and J. H. Gislason, and Others Associating and Acting with Them.

(150 N. W. 750.)

**Verdict — sufficiency of evidence to sustain — criminal action — review on appeal — errors must be specified.**

Defendants are charged with departure from the original Icelandic Luther-

---

Note.—Schism or division in religious societies has been the cause of a considerable amount of litigation, as shown by the cases set forth in a note in 24 L.R.A. (N.S.) 692, which contains an interesting discussion of the principles applicable to the subject, and a brief summary and comparison of the results reached with respect to a few of the historic schisms in ecclesiastical bodies, as well as an exhaustive review of the authorities. These authorities are, of course, confined to cases in which some property or civil right is involved, since the civil courts in this country have no ecclesiastical jurisdiction; and so long as the effects of a schism are confined to spiritual, religious, or theological matters, it furnishes no basis for interference of the civil courts.

an faith, to promulgate which this church was organized in 1889. It joined the Icelandic Lutheran Synod. Both synod and church had written Constitutions and confessional documents, none of which mentioned any dictrine of inspiration of Scripture. A schism arose in the congregation over the doctrine of plenary inspiration of the Bible. Plaintiffs adhered to that doctrine, alleging it to have been presupposed, and therefore understood to have been a fundamental doctrine, in 1889, of the Icelandic Lutheran faith. This defendants deny, and assert that neither the parent church of Iceland nor their own church has ever been bound to any specific doctrine of inspiration of Scripture. In 1910 plaintiffs, a minority, withdrew from the congregation, and refused to participate with the majority in congregational matters. The majority, the defendants as a congregation on June 5, 1910, withdrew Thingvalla Church from the synod, which body had, by resolution in 1909, for the first time placed itself on record as accepting the doctrine of plenary inspiration. The president of the synod was notified thereof June 5, 1910, by written notice. He deferred action thereon, submitting the withdrawal to the synod, which body, on the protest of the minority, these plaintiffs, disapproved of the withdrawal, and passed a resolution holding that the majority had departed from the original faith, and had violated its constitution in so doing, finding them guilty of heresy toward the Lutheran faith and holding the minority to be the true Thingvalla Congregation. All this was without notice to the majority, or any participation by them in the synod, they having treated their withdrawal as effectual from the date notice thereof was given, and had refused to send a delegate to or participate in the proceedings of the synod. This action is brought by the minority for the recovery of the church property, on the grounds that the plaintiffs are the true Thingvalla Congregation, and charging that the defendants are heretical because they disavow the doctrine of plenary inspiration of the Bible. The trial court received in evidence the record of proceedings had at the synod with its findings, and on that, with other testimony, found that the charge was true, and that the plaintiffs were the true congregation, and entitled as such to recover the church property. Defendants appealed, claiming the synodical proceedings not to be binding upon them, and incompetent as evidence; that the evidence is insufficient to sustain the trial court's findings that the doctrine of plenary inspiration, though not mentioned in the constitutions, confessions, or written creeds of the Lutheran Church of Iceland and this church, was, however, presupposed. *Held:*

**Church government — Lutheran form of — synod — withdrawal of congregation from — synodical convention — jurisdiction of.**

1. That the withdrawal of the congregation from the synod was complete under the Lutheran congregational form of church government, upon the passage of the resolution and notice thereof to the president; and that the subsequent proceedings of the synodical convention were had without jurisdiction by it over the defendant congregation, and its *ex parte* action thus taken was void as to the defendant congregation, over whom it had no authority.

**Synodical convention — proceedings — resolutions — records — not admissible against defendant.**

2. The resolution and record of its proceedings were inadmissible in evidence for any purpose over objections taken.

**Plenary inspiration of Bible — doctrine of — no evidence of acceptance of, by church congregation.**

3. That there is no competent evidence supporting the claim of the plaintiffs that, at the time of organization of this church, the doctrine of plenary inspiration of the Bible was a presupposed and accepted fundamental doctrinal belief of the Icelandic Lutheran Church, and as such presupposed by this church constitution and its confessional documents.

**Scriptures — authors — manuscripts — adequately inspired — plenary inspiration — history — science.**

4. It is not held that the authors of the original scriptural manuscripts were not adequately inspired, or that the Scriptures are not adequately inspired. But the doctrine of plenary inspiration of the Bible assumes its entire inerrancy and infallibility in all matters (aside from translation), including fact and doctrine, whether contrary to history or science. There are many doctrines of inspiration of Scripture, such as partial, personal, dynamic, adequate, plenary, verbal, and mechanical. It is held that the evidence does not warrant the findings that this church adopted plenary inspiration as one of its fundamental doctrinal beliefs.

**Findings — order — judgment — action — dismissal.**

5. The findings, order and judgment thereon appealed from are ordered set aside, and judgment directed dismissing this action.

Opinion filed December 12, 1914.  Rehearing denied January 11, 1915.

From a decision of the District Court of Pembina County, TEMPLETON, Special Judge, defendants appeal.

Reversed and dismissed.

*O. B. Burtness* (*H. A. Bergman* and *G. B. Skulason,* of counsel), for appellants.

The doctrine of plenary or verbal inspiration of the Bible is not one of the fundamental doctrines of the Lutheran denomination, and was not such, or adopted as such, by and at the time of the organization of the defendant church congregation, and such doctrine was at no time presupposed by such congregation.

The evidence of theologians and men well versed in the doctrines of the Church of Iceland, and with those of the Lutheran Church, was

and is highly valuable and competent. Young v. Metcalf Land Co. 18 N. D. 441, 122 N. W. 1104; State ex rel. Miller v. Taylor, 22 N. D. 362, 133 N. W. 1046; Rev. Codes, 1905, §§ 5339, 5340, 5347, 5351; Cavazos v. Trevino, 73 U. S. 773, 784, 18 L. ed. 813, 815; Topliff v. Topliff, 122 U. S. 121, 131, 30 L. ed. 1110, 1114, 7 Sup. Ct. Rep. 1057; District of Columbia v. Gallaher, 124 U. S. 505, 510, 31 L. ed. 526, 527, 8 Sup. Ct. Rep. 585; 8 Cyc. 726, 736 and cases cited; 9 Cyc. 588, 772–774 and cases cited; 39 Cyc. 1297 and cases cited; 17 Am. & Eng. Enc. Law, 23–25 and cases cited.

The defendants have at all times adhered to the original position of the congregation on the doctrine of inspiration. The resolutions adopted by defendants are not heretical, and do not violate the constitution of the congregation.

The plaintiffs by calling individual defendants for examination made them their own witnesses, and are bound by the disclosures made. Jones, Ev. § 858, and cases cited; 40 Cyc. 2561 and cases cited.

The congregation had never declared that every part of the Scripture revealed God's word. Adherence to any doctrine of inspiration had not been made a test for membership. East Norway L. N. Evangelical Lutheran Church v. Halvorson, 42 Minn. 503, 44 N. W. 663; Heckman v. Mees, 16 Ohio, 587; Fort v. First Baptist Church, — Tex. Civ. App. —, 55 S. W. 402, 93 Tex. 215, 49 L.R.A. 617, 54 S. W. 892.

It is not sufficient for plaintiffs to show that there has been a change. They must show that the change, if any, violates the fundamental principles of Lutheranism, and that the new doctrine, if any, is not taught by any Lutheran church. Bennett v. Morgan, 112 Ky. 512, 66 S. W. 287, headnote 1; Boyles v. Roberts, 222 Mo. 613, 121 S. W. 807.

Even if the defendants had adopted a new doctrine of inspiration, it could not be regarded as a substantial departure, as adherence to such doctrine was never made a test of membership. Happy v. Morton, 33 Ill. 398; Church of Christ v. Christian Church, 193 Ill. 144, 61 N. E. 1119.

That the plaintiffs stand with the synod, and have departed from the original position of the congregation on the doctrine of inspiration, affords no basis of complaint or action against these defendants. Sudbury v. Bidgood, 13 Ont. Week. Rep. 1097.

The defendant church congregation was and is supreme, so far as the right to manage and control its property is concerned. Philomath College v. Wyatt, 27 Or. 390, 26 L.R.A. 68, 31 Pac. 206, 37 Pac. 1023; Watson v. Jones, 13 Wall. 679, 20 L. ed. 666; Westminster Presby. Church v. Presbytery of New York, 142 App. Div. 855, 127 N. Y. Supp. 841; Poynter v. Phelps, 129 Ky. 381, 24 L.R.A.(N.S.) 734, 111 S. W. 702; Jarrell v. Sproles, 20 Tex. Civ. App. 387, 49 S. W. 908; Fort v. First Baptist Church, — Tex. Civ. App. —, 55 S. W. 407, 93 Tex. 215, 49 L.R.A. 617, 54 S. W. 896; Dressen v. Brameier, 56 Iowa, 756, 9 N. W. 194; Duessel v. Proch, 78 Conn. 343, 3 L.R.A. (N.S.) 854, 62 Atl. 154; Schradi v. Dornfeld, 52 Minn. 465, 55 N. W. 50; Fadness v. Braunborg, 73 Wis. 257, 41 N. W. 84; East Norway L. N. Evangelical Lutheran Church v. Halvorson, 42 Minn. 503, 44 N. W. 663.

In this class of cases it is necessary for plaintiffs to plead and prove what are the particular tenets from which the defendants have departed. They must also allege and prove their own adherence. They must also allege and prove defendants' incorporation. Happy v. Morton, 33 Ill. 398; 24 Am. & Eng. Enc. Law, 358; 31 Cyc. 116, and cases cited; Rev. Codes, 1905, § 7361.

The Icelandic Synod had no jurisdiction to pass upon the matters involved in this action. Their acts in doing so were and are void, and all evidence relating thereto was improperly admitted. Bartholomew v. Lutheran Congregation, 35 Ohio St. 567, and cases cited; Lawson v. Kolbenson, 61 Ill. 405; Pulis v. Iserman, 71 N. J. L. 408, 58 Atl. 554; 34 Cyc. 1141 and cases cited in note 65; Vargo v. Vajo, 76 N. J. Eq. 161, 73 Atl. 647; Schradi v. Dornfeld, 52 Minn. 465, 55 N. W. 50; Heckman v. Mees, 16 Ohio, 583; Fadness v. Braunborg, 73 Wis. 257, 41 N. W. 84; Duessel v. Proch, 78 Conn. 343, 3 L.R.A.(N.S.) 854, 62 Atl. 154.

It is elemental that in such cases the rules of the common law prevail, and that ecclesiastical tribunals have no greater powers than civil courts, and cannot deprive individuals or congregations of their property "without a hearing and trial upon adequate notice." 34 Cyc. 1190 and cases cited; Philomath College v. Wyatt, 27 Or. 390, 26 L.R.A. 68, 31 Pac. 219, 37 Pac. 1022; Kerr's Appeal, 89 Pa. 97; Jarrell v. Sproles, 20 Tex. Civ. App. 387, 49 S. W. 904.

Service of proper notice and formal charges is jurisdictional. 11 Cyc. 666, 667, 671 and cases cited; 23 Cyc. 1074, 1075, and cases cited; Fenton v. Minnesota Title Ins. & T. Co. 15 N. D. 365, 125 Am. St. Rep. 599, 109 N. W. 363; 32 Cyc. 448 and cases cited.

The synod is merely an advisory body. Fadness v. Braunborg, 73 Wis. 257, 41 N. W. 84; East Norway L. N. Evangelical Lutheran Church v. Halvorson, 42 Minn. 503, 44 N. W. 663.

The rule prevailing in all Lutheran churches is that, notwithstanding a congregation may have joined a synod, it remains supreme so far as the right to manage and control its property is concerned. Dressen v. Brameier, 56 Iowa, 756, 9 N. W. 194; Duessel v. Proch, 78 Conn. 343, 3 L.R.A.(N.S.) 854, 62 Atl. 154; Fadness v. Braunborg, supra; East Norway L. N. Evangelical Lutheran Church v. Halvorson, supra; 8 Cyc. 773 and cases cited.

The jurisdiction of an ecclesiastical tribunal is subject to collateral attack. Note to Mack v. Kime, 24 L.R.A.(N.S.) 702; Bear v. Heasley, 98 Mich. 279, 24 L.R.A. 615, 57 N. W. 281; Chase v. Cheney, 58 Ill. 509, 11 Am. Rep. 95; Krecker v. Shirey, 163 Pa. 534, 29 L.R.A. 481, 30 Atl. 440 and cases cited; Boyles v. Roberts, 222 Mo. 613, 121 S. W. 809; 34 Cyc. 1167, note 65, 1186–1187 and cases cited; 24 Am. & Eng. Enc. Law, 349, 350; Ramsey v. Hicks, 44 Ind. App. 490, 87 N. E. 1102, 89 N. E. 597; Baker v. Fales, 16 Mass. 488; Sanders v. Baggerly, 96 Ark. 117, 131 S. W. 56; 3 Cyc. 735; Jones, Ev. § 266; Schnorr's Appeal, 67 Pa. 138, 5 Am. Rep. 415; Roshi's Appeal, 69 Pa. 462, 8 Am. Rep. 275; Baker v. Ducker, 79 Cal. 365, 21 Pac. 764; Rottmann v. Bartling, 22 Neb. 375, 35 N. W. 126.

It was error to admit testimony as to the beliefs of individual witnesses and members of the congregation, or to allow the parties and witnesses to be questioned as to their private religious beliefs. Watson v. Jones, 13 Wall. 679, 20 L. ed. 666; First Baptist Church v. Fort, 93 Tex. 215, 49 L.R.A. 617, 54 S. W. 896; Mack v. Kime, 129 Ga. 1, 24 L.R.A.(N.S.) 675, 58 S. E. 195; Wigmore, Ev. § 2214 and cases cited; 40 Cyc. 2613, 2614 and cases cited; Searcy v. Miller, 57 Iowa, 613, 10 N. W. 912; Com. v. Burke, 16 Gray, 33; N. D. Const. § 4; State v. Washington, 49 La. Ann. 1602, 42 L.R.A. 553, 22 So. 841;

Pumphrey v. State, 84 Neb. 636, 23 L.R.A.(N.S.) 1023, 122 N. W. 19, 18 Ann. Cas. 979.

It was error to allow certain witnesses to testify as to opinions formerly held by the witness Bergmann and as to writings not in evidence. 40 Cyc. 2719, et seq., 2732, 2747, and cases cited; Jones, Ev. §§ 809, quoted at page 74 supra, 848.

It was error to admit any so-called expert testimony as to the meaning of the various expressions and phrases in the constitution of the corporation, as the same is not a proper subject for such testimony. 8 Cyc. 732 and cases cited; 9 Cyc. 774 and cases cited; 17 Cyc. 596 and cases cited; 36 Cyc. 1137–1138 and cases cited.

The property here in question is not impressed with any express trust, and no trust will be implied. Pulis v. Iserman, 71 N. J. L. 408, 58 Atl. 556; Rev. Codes, 1905, §§ 5333, 5343; Alsterberg v. Bennett, 14 N. D. 596, 106 N. W. 49; Wallace v. Hughes, 131 Ky. 445, 115 S. W. 684; Keyser v. Stansifer, 6 Ohio, 363; 34 Cyc. 1169; 24 Am. & Eng. Enc. Law, 356; Poynter v. Phelps, 129 Ky. 381, 24 L.R.A. (N.S.) 734, 111 S. W. 699; Smith v. Nelson, 18 Vt. 511; Mack v. Kime, 129 Ga. 1, 24 L.R.A.(N.S.) 675, 58 S. E. 184.

The majority, in such cases, has the right to rule, regardless of any change of religious views or teachings. 34 Cyc. 1155, 1158, 1159, and notes 18, 1160, 1165, and note 65 at page 1167; 24 Am. & Eng. Enc. Law, 357, 360 (New York Rule); Calkins v. Cheney, 92 Ill. 463; Watkins v. Wilcox, 66 N. Y. 654; Brundage v. Deardorf, 34 C. C. A. 304, 92 Fed. 214; Harris v. Crosby, 173 Ala. 81, 55 So. 231, head-note 3; Munson v. Bringe, 146 Wis. 393, 131 N. W. 904, Ann. Cas. 1912C, 325; Westminster Presby. Church v. Presbytery of New York, 142 App. Div. 855, 127 N. Y. Supp. 836 and head-note 4; Const. of Congregation, art. 5.

The highest ecclesiastical judicatory in the case of an independent congregation is the majority of such congregation, and civil courts must accept as final, on doctrinal points, such decision. Horsman v. Allen, 129 Cal. 131, 61 Pac. 796.

The constitution of the congregation is in the nature of a contract between the members. Jarrell v. Sproles, 20 Tex. Civ. App. 387, 49 S. W. 904; Bear v. Heasley, 98 Mich. 279, 24 L.R.A. 615, 57 N. W. 271; East Norway L. N. Evangelical Lutheran Church v. Halvorson,

42 Minn. 503, 44 N. W. 663; First Baptist Church v. Fort, 93 Tex. 215, 49 L.R.A. 617, 54 S. W. 892; Wallace v. Hughes, 131 Ky. 445, 115 S. W. 684; Boyles v. Roberts, 222 Mo. 613, 121 S. W. 805; Fuchs v. Meisel, 102 Mich. 357, 32 L.R.A. 92, 60 N. W. 773.

It is the law that a constitution cannot provide that a certain article cannot be amended. A legislative body cannot derogate from or abridge the powers of its successors. Wallace v. Hughes, 131 Ky. 445, 115 S. W. 684; Keyser v. Stansifer, 6 Ohio, 363; Horsman v. Allen, 129 Cal. 131, 61 Pac. 796; Saltman v. Nesson, 201 Mass. 534, 88 N. E. 3; Philomath College v. Wyatt, 27 Or. 390, 26 L.R.A. 68, 31 Pac. 206, 37 Pac. 1030.

In adopting a resolution that is in conflict with the constitution, the majority do not secede or forfeit their right to the property. The resolution is simply void. Bear v. Heasley, 98 Mich. 279, 24 L.R.A. 615, 57 N. W. 270; Horsman v. Allen, 129 Cal. 131, 61 Pac. 796.

Civil courts have no jurisdiction to pass upon the doctrinal question here involved. Wallace v. Hughes, 131 Ky. 445, 115 S. W. 684; Mack v. Kime, 129 Ga. 1, 24 L.R.A.(N.S.) 675, 58 S. E. 184; Ramsey v. Hicks, 174 Ind. 428, 30 L.R.A.(N.S.) 665, 91 N. E. 344, 92 N. E. 164; First Presby. Church v. First Cumberland Presby. Church, 245 Ill. 74, 91 N. E. 761, 19 Ann. Cas. 275; Clark v. Brown, — Tex. Civ. App. —, 108 S. W. 421; Mt. Helm Baptist Church v. Jones, 79 Miss. 488, 30 So. 716; Christian Church v. Sommer, 149 Ala. 145, 8 L.R.A.(N.S.) 1031, 123 Am. St. Rep. 27, 43 So. 8; Wehmer v. Fokenga, 57 Neb. 510, 78 N. W. 31; Franke v. Mann, 106 Wis. 118, 48 L.R.A. 856, 81 N. W. 1019; Moseman v. Heitshusen, 50 Neb. 420, 69 N. W. 957; Watson v. Garvin, 54 Mo. 353; East Norway L. N. Evangelical Lutheran Church v. Halvorson, 42 Minn. 503, 44 N. W. 666; Jarrell v. Sproles, 20 Tex. Civ. App. 387, 49 S. W. 908; Poynter v. Phelps, 129 Ky. 381, 24 L.R.A.(N.S.) 734, 111 S. W. 702; Boyles v. Roberts, 222 Mo. 613, 121 S. W. 805; Sanders v. Baggerly, 96 Ark. 117, 131 S. W. 49; Ark-Mo Zinc Co. v. Patterson, 79 Ark. 506, 96 S. W. 170; Jones, Ev. § 266 and cases cited.

The defendant was duly incorporated under the laws of this state, and the former voluntary association ceased to exist. 34 Cyc. 1157 and cases cited in note 5 and page 1158, 1168, 1196 and cases cited in note 13; Holm v. Holm, 81 Wis. 374, 51 N. W. 579; 24 Am. & Eng.

Enc. Law, 361, 362, and cases cited; Fadness v. Braunborg, 73 Wis. 257, 41 N. W. 91; Gewin v. Mt. Pilgrim Baptist Church, 166 Ala. 345, 139 Am. St. Rep. 41, 51 So. 947; Happy v. Morton, 33 Ill. 398; State v. First Catholic Church, 88 Neb. 2, 128 N. W. 657; Rev. Codes 1905, §§ 4539, 4816.

The plaintiff had due notice of the proposed corporation. Dubs v. Egli, 167 Ill. 514, 47 N. E. 768; Klix v. Parish, 137 Mo. App. 347, 118 S. W. 1171, head-note 3; 24 Am. & Eng. Enc. Law, 329, 330 and cases cited; 34 Cyc. 1120 and cases cited in note 27; Fadness v. Braunborg, 73 Wis. 257, 41 N. W. 84; Calkins v. Cheney, 92 Ill. 463; Horst v. Traudt, 43 Colo. 445, 96 Pac. 259; Wilson v. Livingstone, 99 Mich. 594, 58 N. W. 646.

The plaintiffs sue merely as trustees of Thingvalla Congregation, and must succeed or fail in that capacity. Turpin v. Bagby, 138 Mo. 7, 39 S. W. 455; Lawson v. Kolbenson, 61 Ill. 405; Cooke v. Northern P. R. Co. 22 N. D. 266, 133 N. W. 308; Mutual L. Ins. Co. v. Inman Park Presby. Church, 111 Ga. 677, 36 S. E. 880; Movius v. Propper, 23 N. D. 452, 136 N. W. 942; Fadness v. Braunborg, 73 Wis. 257, 41 N. W. 92; 32 Cyc. 1426; 34 Cyc. 1133 and note 83, page 1171; 24 Am. & Eng. Enc. Law, 342–343, 359; Fort v. First Baptist Church, — Tex. Civ. App. —, 55 S. W. 402; Bartholomew v. Lutheran Congregation, 35 Ohio St. 567; Long v. Harvey, 177 Pa. 473, 34 L.R.A. 169, 55 Am. St. Rep. 733, 35 Atl. 869; West Koshkonong Congregation v. Ottesen, 80 Wis. 62, 49 N. W. 24; East Norway L. N. Evangelical Lutheran Church v. Halvorson, 42 Minn. 503, 44 N. W. 663; Rev. Codes 1905, § 4213; Red Polled Cattle Club v. Red Polled Cattle Club, 108 Iowa, 105, 78 N. W. 803; 4 Cyc. 312 and cases cited; 30 Cyc. 27, 29 and cases cited; Dale v. Hunneman, 12 Neb. 221, 10 N. W. 711.

Before passage of the resolution of which complaint is made, plaintiffs had ceased to be members of the congregation, and therefore cannot be heard to complain. Watson v. Jones, 13 Wall. 679, 20 L. ed. 666; First Baptist Church v. Fort, 93 Tex. 215, 49 L.R.A. 617, 54 S. W. 892; Dubs v. Egli, 167 Ill. 514, 47 N. E. 766; Christian Church v. Church of Christ, 219 Ill. 503, 76 N. E. 703; Const. of Congregation, Art. 9, § 1; Lutheran Congregation v. St. Michael's Evangelical Church, 48 Pa. 20; 24 Am. & Eng. Enc. Law, 358; Gewin v. Mt.

Pilgrim Baptist Church, 166 Ala. 345, 139 Am. St. Rep. 41, 51 So. 948.

In any event, such resolution was passed unanimously. Pulis v. Iserman, 71 N. J. L. 408, 58 Atl. 554; Kuns v. Robertson, 154 Ill. 394, 40 N. E. 343; Philomath College v. Wyatt, 27 Or. 390, 26 L.R.A. 68, 31 Pac. 206, 37 Pac. 1022; Vargo v. Vajo, 76 N. J. Eq. 161, 73 Atl. 644; Schlichter v. Keiter, 156 Pa. 119, 22 L.R.A. 161, 27 Atl. 45; Lamb v. Cain, 129 Ind. 486, 14 L.R.A. 518, 29 N. E. 13; Russie v. Brazzell, 128 Mo. 93, 49 Am. St. Rep. 542, 30 S. W. 526; Brundage v. Deardorf, 34 C. C. A. 304, 92 Fed. 214; 4 Cyc. 308 and cases cited; West Koshkonong Congregation v. Otteson, 80 Wis. 62, 49 N. W. 24.

The discharge of the pastor relates to the temporal matters of the church, and does not operate as a change of faith. Fadness v. Braunborg, 73 Wis. 257, 41 N. W. 84.; 24 Am. & Eng. Enc. Law, 352; 34 Cyc. 1146.

The corporation which has the legal title to and possession of the property in question is not in court. Hence any relief granted would be unavailing. Rev. Codes 1905, § 7361; First Baptist Church v. Fort, 93 Tex. 215, 49 L.R.A. 617, 54 S. W. 892; Riffe v. Proctor, 99 Mo. App. 601, 74 S. W. 409; Lawson v. Kolbenson, 61 Ill. 405; Allen v. Duffie, 43 Mich. 1, 38 Am. Rep. 159, 4 N. W. 427.

The resolution adopted does not in any case amount to a fundamental departure from the original position of the congregation on the doctrine of inspiration. 34 Cyc. 1166, 1167 and cases cited; 24 Am. & Eng. Enc. Law, 351, 352; Fadness v. Braunborg, 73 Wis. 257, 41 N. W. 95; Happy v. Morton, 33 Ill. 398; Lawson v. Kolbenson, 61 Ill. 405; Watson v. Jones, 13 Wall, 679, 20 L. ed. 666; Note to Mack v. Kime, 24 L.R.A.(N.S.) 714.

Even if this were an equitable action, the equities are against the plaintiffs, and they must fail. Pulis v. Iserman, 71 N. J. L. 408, 58 Atl. 554; Vargo v. Vajo, 76 N. J. Eq. 161, 73 Atl. 644; Fadness v. Braunborg, 73 Wis. 257, 41 N. W. 84; Duessel v. Proch, 78 Conn. 343, 3 L.R.A.(N.S.) 854, 62 Atl. 152.

*Sveinbjorn Johnson* (*Gislason & Gislason,* of counsel), for respondents.

It is highly proper to call persons as expert witnesses in cases of

this character, to explain, define, and construe technical religious terms and phrases. 17 Cyc. 685; Dunnell's Minn. Trial Book, 269, § 1187; Cargill v. Thompson, 57 Minn. 534, 59 N. W. 640; 1 Greenl. Ev. 16th ed. § 280.

The constitution of Thingvalla Congregation provides that if a division occur in the congregation, the property shall belong to the "portion as adheres to this constitution." The majority of the congregation —these defendants—is guilty of a direct violation of its own constitution. 34 Cyc. 1184 and note 53, cases cited, 1185 and cases cited; State ex rel. Watson v. Farris, 45 Mo. 183; Shannon v. Frost, 3 B. Mon. 253; Gibson v. Armstrong, 7 B. Mon. 481.

Civil courts have no ecclesiastical jurisdiction, and when the general assembly or synod of the church decides, the matter is settled. Mack v. Kime, 129 Ga. 1, 24 L.R.A.(N.S.) 675, 58 S. E. 184, and cases cited; Watson v. Jones, 13 Wall. 679, 20 L. ed. 666; Chase v. Cheney, 58 Ill. 509.

Civil courts will not review the decisions of church tribunals upon ecclesiastical matters merely to determine their jurisdiction. Such decisions are final, and their regularity will not be inquired into. Trinity M. E. Church v. Harris, 73 Conn. 216, 50 L.R.A. 636, 47 Atl. 116; Robertson v. Bullions, 9 Barb. 65; Bouldin v. Alexander, 15 Wall. 131, 21 L. ed. 69.

If the complaint fails to state a cause of action—is indefinite and uncertain—their remedy was by motion to have the pleading made more certain. They cannot raise such objection for the first time upon the trial. Weber v. Lewis, 19 N. D. 473, 34 L.R.A.(N.S.) 364, 126 N. W. 105; Pom. Code Remedies, § 549; Rev. Codes 1905, §§ 6870, 6883; Tisdale v. Ward County, 20 N. D. 401, 127 N. E. 516; Johnson v. Burnside, 3 S. D. 230, 52 N. W. 1057; Pugh v. Winona & St. P. R. Co. 29 Minn. 390, 13 N. W. 189; St. Paul Trust Co. v. St. Paul Chamber of Commerce, 70 Minn. 486, 73 N. W. 408; Bauman v. Bean, 57 Mich. 1, 23 N. W. 451; Langford v. Issenhuth, 28 S. D. 451, 134 N. W. 889; South Milwaukee Co. v. Murphy, 112 Wis. 614, 58 L.R.A. 82, 88 N. W. 583; Stenson v. Elfmann, 26 S. D. 134, 128 N. W. 588; Rogers v. Penobscot Min. Co. 28 S. D. 72, 132 N. W. 792, Ann. Cas. 1914A, 1184.

The practice of pleading to the merits, and then at the trial raising an

objection in the nature of a demurrer, is not sanctioned or approved. Norton v. Colgrove, 41 Mich. 544, 3 N. W. 159; Barton v. Gray, 48 Mich. 164, 12 N. W. 30; Lamb v. Jeffrey, 41 Mich. 719, 3 N. W. 204; Burke v. Wilber, 42 Mich. 327, 3 N. W. 861; Rogers v. Penobscot Min. Co. 28 S. D. 72, 132 N. W. 792, Ann. Cas. 1914A, 1184; 31 Cyc. 714, 723; Sheibley v. Huse, 75 Neb. 811, 106 N. W. 1028, 13 Ann. Cas. 376; Langford v. Issenhuth, 28 S. D. 451, 134 N. W. 889.

Defendants are estopped to raise such questions at this time, because they submitted themselves to the jurisdiction of the trial court by voluntary general appearance. Rev. Codes 1905, § 6850; 3 Cyc. 515 (II) and notes; McKillip v. Harvey, 80 Neb. 264, 114 N. W. 155; Farmers' Loan & T. Co. v. Joseph, 86 Neb. 256, 125 N. W. 533; Lillie v. Modern Woodmen, 89 Neb. 1, 130 N. W. 1004; Bestor v. Inter-County Fair, 135 Wis. 339, 115 N. W. 809; Rogers v. Penobscot Min. Co. 28 S. D. 72, 132 N. W. 792, Ann. Cas. 1914A, 1184.

The constitution provides that if a division occurs in the congregation, the property shall belong to such portion as adheres to the constitution. 34 Cyc. 1167, 1168; Venable v. Hoffman, 2 W. Va. 310; Nance v. Busby, 91 Tenn. 303, 15 L.R.A. 801, 18 S. W. 874; Watson v. Jones, 13 Wall. 679, 20 L. ed. 666; Smith v. Pedigo, 145 Ind. 361, 19 L.R.A. 433, 32 L.R.A. 838, 33 N. E. 777, 44 N. E. 363; Krecker v. Shirey, 163 Pa. 534, 29 L.R.A. 476, 30 Atl. 440; Mt. Zion Baptist Church v. Whitmore, 83 Iowa, 138, 13 L.R.A. 198, 49 N. W. 81; Fadness v. Braunborg, 73 Wis. 257, 41 N. W. 84.

Either legal or equitable title in the plaintiffs is sufficient to enable them to maintain this action. Conrad v. Adler, 13 N. D. 199, 100 N. W. 722; Rev. Codes 1899, § 5904; Laws 1901, chap. 5, p. 9; Merrill v. Dearing, 47 Minn. 137, 49 N. W. 693; Freeman v. Brewster, 70 Minn. 203, 72 N. W. 1068; Hoppough v. Struble, 60 N. Y. 434; Pom. Remedies, 101; 20 Am. & Eng. Enc. Law, 793; Turpin v. Bagby, 138 Mo. 7, 39 S. W. 455; Dale v. Hunneman, 12 Neb. 221, 10 N. W. 711; Rev. Codes 1905, § 6767; Fuchs v. Meisel, 102 Mich. 357, 32 L.R.A. 92, 60 N. W. 778; Sykes v. First Nat. Bank, 2 S. D. 242, 49 N. W. 1061; 34 Cyc. 1170, 1171, 1196; Hall v. Henderson, 61 L.R.A. 621 and syllabi 4 and 5; Arts v. Guthrie, 75 Iowa, 674, 37 N. W. 395; St. Patrick's Roman Catholic Church v. Gavalon, 82 Ill. 170, 25 Am. Rep. 305; First Baptist Church v. Caughey, 85 Pa. 271.

Trustees of associations of this kind have powers coextensive with those of the association. 34 Cyc. 1134, 1173, 1174, 1194, 1195 and notes, 1196 and notes 14 and 15; White v. Rice, 112 Mich. 403, 70 N. W. 1026; Fuchs v. Meisel, 102 Mich. 357, 32 L.R.A. 92, 60 N. W. 773; Fernstler v. Seibert, 114 Pa. 196, 6 Atl. 165; Kreglo v. Fulk, 3 W. Va. 74; Lilly v. Tobbein, — Mo. —, 13 S. W. 1060; Callsen v. Hope, 75 Fed. 758; Drumheller v. First Universalist Church, 45 Ind. 275; Smith v. Pedigo, 145 Ind. 361, 19 L.R.A. 433, 32 L.R.A. 838, 33 N. E. 777, 44 N. E. 363; Schnorr's Appeal, 67 Pa. 138, 5 Am. Rep. 415; 1 Abbott, Forms of Pl. p. 26; Rev. Codes 1905, § 6818; Sykes v. First Nat. Bank, 2 S. D. 242, 49 N. W. 1063.

The property of the congregation was impressed with a trust. A conveyance or bequest to a religious association or trustees for same charges the property with a trust. Marien v. Evangelical Creed Congregation, 132 Wis. 650, 113 N. W. 66, 140 Wis. 31, 121 N. W. 604; Munson v. Bringe, 146 Wis. 393, 131 N. W. 905, Ann. Cas. 1912C, 325; Fuchs v. Meisel, 102 Mich. 357, 32 L.R.A. 92, 60 N. W. 777; Smith v. Pedigo, 145 Ind. 361, 19 L.R.A. 433, 32 L.R.A. 838, 33 N. E. 777, 44 N. E. 363; 4 Cyc. 308 (II.); 34 Cyc. 1164 and 1165 and note 57 citing cases, 1167, 1168 and notes citing numerous cases; Mack v. Kime, 24 L.R.A.(N.S.) 675, and extensive note, 129 Ga. 1, 58 S. E. 184; Watson v. Jones, 13 Wall. 679, 20 L. ed. 666.

All the equities of the case are with the plaintiff. Smith v. Pedigo, 145 Ind. 361, 19 L.R.A. 433, 32 L.R.A. 838, 33 N. E. 777, 44 N. E. 363.

The rule of the majority cannot be held to authorize a change of faith and practice by a vote of the majority. All members were expected to either subscribe or assent to the Articles of Faith, and be in harmony with them. This in itself affords an exception to the right of the majority to rule in such matters. 34 Cyc. 1167–1169; Mt. Zion Baptist Church v. Whitmore, 83 Iowa, 138, 13 L.R.A. 198, 49 N. W. 81; East Norway L. N. Evangelical Lutheran Church v. Halvorson, 42 Minn. 503, 44 N. W. 663; Nance v. Busby, 91 Tenn. 303, 15 L.R.A. 801, 18 S. W. 874; Boyles v. Roberts, 222 Mo. 613, 121 S. W. 805; Baker v. Ducker, 79 Cal. 365, 21 Pac. 764; Christian Church v. Church of Christ, 219 Ill. 503, 76 N. E. 703; Venable v. Coffman, 2 W. Va. 320; Gable v. Miller, 10 Paige, 627; Den ex dem.

Day v. Bolton, 12 N. J. L. 236; Finley v. Brent, 87 Va. 103, 11 L.R.A. 214, 12 S. E. 228; Krecker v. Shirey, 163 Pa. 534, 29 L.R.A. 476, 30 Atl. 440; Franke v. Mann, 106 Wis. 118, 48 L.R.A. 856, 81 N. W. 1014; Marien v. Evangelical Creed Congregation, 132 Wis. 650, 113 N. W. 66; Yanthis v. Kemp, 43 Ind. App. 203, 85 N. E. 976, 86 N. E. 451; Mt. Helm Baptist Church v. Jones, 79 Miss. 488, 30 So. 714; Reorganized Church of Jesus Christ, L. D. S. v. Church of Christ, 60 Fed. 937; Sutter v. First Reformed Dutch Church, 42 Pa. 503; Jarrell v. Sproles, 20 Tex. Civ. App. 387, 49 S. W. 904; Hendryx v. People's United Church, 42 Wash. 336, 4 L.R.A.(N.S.) 1154, 84 Pac. 1123, 7 Ann. Cas. 764; Kniskern v. Lutheran Churches, 1 Sandf. Ch. 439; Smith v. Pedigo, 145 Ind. 361, 19 L.R.A. 433, 32 L.R.A. 838, 33 N. E. 777, 44 N. E. 363; Boyles v. Roberts, 222 Mo. 613, 121 S. W. 805; Ferraria v. Vasconcellos, 31 Ill. 46; Robertson v. Bullions, 9 Barb. 126.

Evidence as to the position of the pastors they employed, and as to their teachings from the pulpit, is clearly competent. 3 Chamberlayne, Ev. §§ 1725, 1755; 1 Wigmore, Ev. §§ 265, 266.

Even if such evidence is not proper, the presumption is that the trial court disregarded same. Rev. Codes 1905, § 7020; Jones, Ev. §§ 873, 897; Wigmore, Ev. §§ 43-47; Canfield Lumber Co. v. Kint Lumber Co. 148 Iowa, 207, 127 N. W. 70; Spaulding v. Chicago, St. P. & K. C. R. Co. 98 Iowa, 205, 67 N. W. 227; Borneman v. Chicago, St. P. M. & O. R. Co. 19 S. D. 459, 104 N. W. 211; Waterhouse v. Jos. Schlitz Brewing Co. 16 S. D. 593, 94 N. W. 587; 34 Cyc. 1119.

Where the constitution of a religious association provides that the section thereof which relates to the doctrines of faith cannot be amended, any amendment thereof amounting to a departure from the doctrines of faith laid down therein operates as a diversion of the trust property; and those who attempted to effect such amendment are seceders. East Norway L. N. Evangelical Lutheran Church v. Halvorson, 42 Minn. 503, 44 N. W. 667; Schlichter v. Keiter, 156 Pa. 119, 22 L.R.A. 161, 27 Atl. 45; Austin v. Searing, 16 N. Y. 112, 69 Am. Dec. 665; 34 Cyc. 1120, 1164, 1165.

The question of jurisdiction and of the right of plaintiffs to proceed as they did is purely a matter of ecclesiastical law, and procedure with which the civil courts will not interfere. Pounder v. Ashe,

44 Neb. 672, 63 N. W. 48; Bonacum v. Harrington, 65 Neb. 831, 91 N. W. 888; State ex rel. Watson v. Ferris, 45 Mo. 183; Gaff v. Greer, 88 Ind. 122, 45 Am. Rep. 449; Chase v. Cheney, 58 Ill. 509, 11 Am. Rep. 95.

Goss, J. This is an action at law for the recovery of the possession of the property and records of the Thingvalla Lutheran Church, a religious corporation. The defendant society had existed as an unincorporated religious association from its organization in 1889 until the summer of 1910. In 1909 a schism arose over different beliefs as to the inspiration of the Scriptures. In May, 1910, plaintiffs, members of the society, withdrew from participation in congregational matters. The defendants, the majority, discharged their pastor, and over the protest of the minority withdrew the congregation from the synod to which it had belonged for years, and then incorporated it. At the request of the minority, and without participation of or notice to the majority, the synod by resolution recognized the minority as the true congregation, and declared that the majority had, because of the views on the inspiration of Scripture, departed from the original religious faith of the association, and had thereby violated the constitution of the Thingvalla Church Society. The minority by its trustees then brought this action, charging the defendant and its membership with a departure from the original faith upon and to promulgate which the religious association was founded. This defendants deny.

A jury was waived. The charge laid was found to be true, and judgment was entered in favor of plaintiffs. Defendants appeal.

The particular findings necessary for consideration are but the third and fourth. The third reads, "that the doctrine of plenary inspiration of the Bible is one of the fundamental doctrines of the Lutheran denomination." The fourth was "that the doctrine of the plenary inspiration of the Bible was one of the fundamental doctrines of the faith of the Thingvalla Congregation at the time of its organization, and that the constitution of the Thingvalla Congregation at that time and ever since has presupposed, and now presupposes, that doctrine." Both findings are challenged on this appeal as unsupported by sufficient competent evidence.

The first requisite in determining whether there has been a departure from the original faith is to determine what that faith was with particular reference to the doctrine of plenary inspiration now asserted to have been a part of it, the abandonment of which is the alleged heresy. Plenary inspiration as a doctrine means more than that the Scriptures are inspired. American Encyclopedia 1914 ed. vol. 11, under "Inspiration," and vol. 13, same work, subjects "Lutheran Church in America," and "Lutheranism," Nelson's Encyclopedia, vol. 6, "Inspiration." Century Dictionary defines plenary inspiration thus: "What is meant by 'plenary inspiration?' A divine influence full and sufficient to secure its end. The end in this case secured is the perfect infallibility of the Scriptures in every part, as a record of fact and doctrine, both in thought and verbal expression." It is defined by experts called herein as meaning that the Scriptures were written by men so fully inspired that whatever they wrote was the word of God himself and without error. Upon this doctrine is predicated the conclusion that no human, therefore, has the right to reject as fallacious or erroneous any portion of the Bible, the perfect work of the Divine. The Bible is therefore above the right of private judgment as to either its authenticity or its verity. This constitutes the doctrinal claim of the advocates of plenary inspiration. On the contrary, defendants *recognizing the Scriptures as inspired,* advocate the right of private judgment as to all matters of Holy Writ, and deny the doctrine of plenary inspiration, and assert that plenary inspiration was never a doctrine, fundamental or otherwise, in either their association or of the Lutheran Church of Iceland, from which it sprang and to which it is alleged to be in conformity according to its very constitution.

This leads to the documentary evidence of the fundamental belief of this society and its parent church of Iceland, followed by a consideration of its relations as a congregation to this synod, its withdrawal from it, and validity of any action taken by the synod in the matter.

The constitution of the congregation as originally adopted is now set forth:

### Article 1.—Name.

The name of our congregation is Thingvalla Congregation.

## Article 2.—Confession.

The Word of God as it is revealed in the canonical Scriptures is the true fountain and the perfect law of the congregation in matters of doctrine, faith, and morals.

2. The congregation accepts the doctrines of Holy Scriptures in conformity with the Lutheran Church in Iceland as expressed in its confessional documents.

3. The congregation shall be affiliated with the Lutheran Synod of Icelanders in this country, which accepts the same confession as the congregation.

## Article 5.—Rights.

1. The congregation has power to decide and make disposition of all congregational matters. The majority rules at meetings.

## Article 11.—Property.

The property of this congregation cannot pass into the hands of anyone else, unless the congregation so determines by two thirds of all votes. If a division occurs in the congregation, the property shall belong to such portion as adheres to this constitution.

## Article 13.—Amendments.

This constitution cannot be amended unless such amendment be adopted by a two-thirds vote at a congregational meeting. It must, however, have been brought up and discussed at the next preceding meeting. But section 1 of this article 2 can never be amended.

The constitution of the synod, necessary to an understanding of the issues, is set forth:

## Article I.

The name of the synod is "The Evangelical Lutheran Synod of Icelanders in America."

## Article II.

The purpose of the synod is to further harmony and co-operation of

Christian congregations of the Icelandic nationality on this Continent, and generally to promote Christian life and religion wherever its influence may reach.

### Article III.

The synod believes that the Holy Scriptures, that is, the canonical books of the Old and New Testaments, are the revealed Word of God, and the only true and reliable rule of belief, doctrine, and life of men.

### Article IV.

The synod recognizes the Ecumenical Confessions of the Church, as well as the unaltered Augsburg Confession and Lutheran's Catechism, as a correct exposition and interpretation of the Holy Word of God.

### Article V.

The synod shall have supervision over its individual congregations, and advise them in regard to government, ecclesiastical ceremonies, and the external forms of the Divine services. It shall also exercise a church discipline, pure and in conformity with the Word of God, for the maintenance and promotion of the holy office of the clergy, and further to supervise Christian conduct of its congregations, and require of its pastors and congregations faithfulness to its confession.

### Article VIII.

*   *   * (The president shall) settle disputes which may arise within the congregations, and have supervision over the pastors and congregations of the synod. Congregational matters which according to their nature may come before the synod shall, however, be brought up there for final decision if the parties in interest so desire, in accordance with article XI.

### Article XI.

The synod at its annual conventions has the supreme power of decision in all disputes in church matters which may arise between or within its congregations.

## Article XIII.

Every Lutheran congregation of Icelanders in America, which desires to join the synod, must (1) accept its constitution, (2) make written application for admission to the synod, and (3) submit its constitution to the convention for examination. If the convention decides that the constitution of the congregation is in harmony with the constitution of the synod, and consents to the admission of the congregation by a two-thirds vote of the delegates present, the congregation is thereby regularly admitted to the synod.

It is noticeable that at no place in these constitutions is there any specific mention of any doctrine of inspiration. In the first paragraph of article 2 of the constitution of the congregation, and article 3 of the synod constitution, is found the foundation for the claim of the plaintiff's that plenary inspiration was a fundamental doctrine, so much so as to be presupposed by these constitutions. Such was found by the trial court to be the fact.

A discussion of the government of this church in its relations to the synod is now in order. Concededly, the congregation came into existence as an independent society, governed by its constitution, which document then constituted the contractual bond or law resulting therefrom between its members and the association. Bear v. Heasley, 98 Mich. 279, 24 L.R.A. 615, 57 N. W. 270.

The second paragraph of the confession provides "that the congregation accepts the doctrines of Holy Scriptures in conformity with the Lutheran Church in Iceland, as expressed in its confessional documents." Thus these Icelanders organized their society on the same basis of faith as that prevailing in their mother church in Iceland. And such is all the expert testimony. This brings into consideration, as having an important bearing upon the interpretation of this constitution and the determination of the fundamentals of the religious belief of this society, the position of the Lutheran Church in Iceland with reference to *plenary* inspiration of the Bible. Did that church accept *that* doctrine, or was it unknown or undefined in its faith?

What is involved by respondents as evidence asserted to be both strongly persuasive and conclusive is an alleged decision of the synod. The act of the synod must be held to be either a final and conclusive de-

cision of a church tribunal clothed with jurisdiction to determine the questions of plenary inspiration and departure from the faith, or else, on the contrary it must be regarded as its *ex parte* resolution and devoid of authority, of no binding force, void and wholly inadmissible in evidence. Either it was a decision for all purposes, and as such conclusive, or it was nothing. Note to Mack v. Kime, 24 L.R.A.(N.S.) 692, citing many authorities.

This brings into consideration the church polity of this synod and its constituent congregations. The basis for its ecclesiastical system is the constitutions of society and synod as already given. Therefrom it is plain that this church and synod were not governed by a federated form of government, but, rather, what is usually known as the congregational system, wherein the congregations did not surrender their autonomy to the synod, and which body possessed over them but the advisory powers defined by the constitution of the synod. For similar holdings on Lutheran form of church government, see Schradi v. Dornfeld, 52 Minn. 465, 55 N. W. 49; Fadness v. Braunborg, 73 Wis. 257, 41 N. W. 84; Duessel v. Proch, 78 Conn. 343, 3 L.R.A. (N.S.) 854, 62 Atl. 152.

There are two general systems of church polity: One that may be accurately likened to the government of the United States, wherein the units corresponding to our states, the congregations, are held to a federated government, and possess but little power of their own, with no authority to withdraw, with no independence, and governed through a series of higher governing bodies, legislative, executive, and judicial, and in which the congregation as a unit is insignificant, and with the organization as a whole constituting the church. This is well illustrated by the great Catholic, Methodist Episcopal, and Presbyterian church organizations. The other form of church government is merely a confederation or association of independent congregations, each a more or less autonomous body, and more or less loosely confederated, though possessing one or more higher directing and advisory bodies which may, under certain circumstances, also be the judicatory of the congregations thus confederated. The Congregational churches, Baptist, and Lutheran denominations exemplify this form of church polity. With the first class the governing power and authority is imposed from the top down; the opposite with the latter, power being reserved to the

congregations except as granted to the advisory body. Necessarily, in scanning the law and applying precedent, differentiation must be made according to classification of church system considered. A decision by a general assembly of the Presbyterian Church, or by a conference, state or national, of the Methodist Episcopal Church, is not necessarily applicable to this synodical decision, made under the confederated form of church government. See annotated note to Mack v. Kime, 24 L.R.A. (N.S.) 692. Now to examine the facts and situation under which the action of the synod was taken and to determine its effect:

For twenty years this congregation had remained harmonious, until in 1909. A synodical convention was held that year at which were the delegates of this and the other churches in this synod. A resolution, called the Fridriksson resolution, was there introduced. For some time previous to 1909, there had existed two church organs or newspapers, the Breidablik and the Sameiningin, in the columns of which newspapers much space had been devoted to discussion of the doctrine of plenary inspiration. The latter was the advocate, and the former the opponent, of that theory. Their editors were leaders and men of force, and it is likewise apparent that this question thus presented had been widely discussed throughout the synod. Matters came to a head in the synod at its meeting in 1909, through the passage of the so-called Fridriksson resolution, the third paragraph of which, as understood in the light of events, placed the synod on record as adhering to *plenary* inspiration of the Bible. This Thingvalla Congregation then immediately took steps to dismiss their pastor, an adherent of the plenary inspiration theory. He remained, however. This minority faction of plaintiffs developing in the congregation, they on May 21, 1910, voted to no longer participate with the majority, the defendants, in congregational meetings. The next day a meeting of the majority was held at which it was unanimously agreed that the congregation should send no delegate to the coming synodical convention. Instead, they took steps to amend their constitution, preliminary to a withdrawal from the synod, which amendment was passed at a church meeting held June 5, 1910, together with a resolution, unanimously adopted, that the congregation withdraw from the synod; and also a resolution was passed advocating the right of private judgment, condemned by the synod in 1909. The secretary was instructed to notify the president

of the synod of such withdrawal. This was done by letter of June 6, inclosing a copy of the resolution. The president of the synod received this notification, but, instead of accepting it according to article 8 of the synod's constitution, replied by letter that he was "making no decision in the matter, but am referring it to the convention, to be dealt with and disposed of. This I let you know that those who are concerned will have an opportunity to explain the matter to the convention, if they so desire." The majority faction took no action upon this notice, treating their withdrawal as consummated and their society as no longer a member of the synod. The pastor, however, siding with the minority, procured a written remonstrance dated June 10, to be signed by forty-two of the dissenting members. In it the minority "made claim to be the lawful and only Thingvalla Congregation," and asked the synod to "investigate our case, and decide whether or not we are right in this matter." They sent plaintiff Gudmundson with it and as their delegate to the synod, convening June 17. By resolution on June 21, a committee of the synod was appointed to consider the matter, and later the report of the committee was adopted. This resolution was that the majority had violated their own constitution and that of the synod, and that as they would no longer remain within the synod, and because they had removed their minister because of holding different religious doctrines from him, that the petition of the minority be allowed, and the minority was "recognized as the rightful Thingvalla Congregation," and their delegate seated as a delegate from said congregation.

It is conceded that the action of the synod was taken only on the petition of the minority and without any official notice to the majority, of the presentation of said petition or proceedings to be had thereon. The only notice had by the defendant congregation of what might transpire at the synod was that contained in the letter of the president, that the withdrawal would be referred to the synod. The right of the congregation to withdraw by a resolution of a majority of those adhering to its faith is admitted by all. Its withdrawal severed the congregation from the synod *without necessity of consent of that body.* 34 Cyc. 1141; Vargo v. Vajo, 76 N. J. Eq. 161, 73 Atl. 644; Duessel v. Proch, 78 Conn. 343, 3 L.R.A.(N.S.) 854, 62 Atl. 152; Schradi v. Dornfeld, 52 Minn. 465, 55 N. W. 49; Fadness v. Braunborg, 73 Wis.

257, 41 N. W. 84; Heckman v. Mees, 16 Ohio, 583; Bartholomew v. Lutheran Congregation, 35 Ohio St. 567; Lawson v. Kolbenson, 61 Ill. 405; Pulis v. Iserman, 71 N. J. L. 408, 58 Atl. 554. And the learned trial judge so held. It is contended, however, (1) the synod was conclusively the judge of its own jurisdiction to decide upon the petition of the minority, and (2) because the majority had departed from the faith they were not a part of the true congregation, and the synod had authority to so declare, and, having such authority, its decision was final. As to departure from the faith, what is said later in this opinion applies, wherein it is held that there is no evidence upon which that charge can be supported in fact, when once it is determined that the decision of this synod is void. The synod's constitution provides for its authority, and constitutes the contract under which this and other congregations affiliated in its formation. Its purposes are advisory, and that it has been so construed by the synod itself is shown by its resolution discussing the relations of the congregations with that body. Articles 8 and 11 of the synod's constitution, upon which its power to decide in matters of this kind depend, provide that controversies may be "brought there for final decision if the parties in interest so desire, in accordance with article 11," reading: "The synod at its annual conventions has the supreme power of decision in all disputes in church matters which may arise between or within its congregations." The synod by its action passed upon this matter *ex parte,* without notification, and some weeks after this church had withdrawn from the synod. In the congregational form of church government majorities control as to identity of organization, and so long as the majority adhere to the fundamental faith they constitute the legal entity, the congregation. If the synod could pass upon their guilt of heresy weeks after they had withdrawn from it and without notification, it could convict them of that charge, and do as it did. But no authority seems to support its right to do so. Where a matter of jurisdiction to decide is properly before such a tribunal, its decision taking jurisdiction is as conclusive as its decision on the merits, and had this church the federal form of government, and defendant been unable to withdraw from the synod, the action of that body might have been effective. Under such circumstances the court could refuse to pass upon the matter, and compel the parties to litigate before their church tribunal. But here

the defendant congregation, having withdrawn, has no such tribunal. It also has the right to remain aloof as an independent organization, and therefore can demand that the civil courts decide this matter so far, and so far only, as its property rights are involved. Note to Mack v. Kime, 24 L.R.A.(N.S.) 692. Carried to its logical end, if these defendants are bound by this action of the synod, a majority of that advisory body may, in disregard of its own constitution and those of its congregations, by this simple method of declaring any congregation withdrawing (by due action of a majority thereof) to be guilty of heresy or a violation of their constitution, and by recognizing a minority, however small, may nullify altogether the congregational right of withdrawal, and place the church by such action virtually under a federated form of church polity. To the extent that these constitutions are intelligible to any except the expert, courts must construe them as they would any instrument, and thus limit the power of the synod. The *ex parte* declaration of that body is not conclusive, and not a decision, which, if valid, would be *res judicata* on the merits.

But is the declaration of this body receivable in evidence over the objections made? The learned trial court held that it was not a decision, but accepted it as "very persuasive evidence tending to establish the correctness of plaintiff's contention." If evidence at all, it is to be taken at its face. It is either inadmissible as evidence, or else conclusive. There are no authorities supporting the trial court's theory and the one here advanced by the respondents. On the contrary, many authorities hold the action of the synod void, as of a body without jurisdiction, and as inadmissible for any purpose. Bartholomew v. Lutheran Congregation, 35 Ohio St. 567; Lawson v. Kolbenson, 61 Ill. 405; Pulis v. Iserman, 71 N. J. L. 408, 58 Atl. 554. Respondents cite as to the contrary, Pounder v. Ashe, 44 Neb. 672, 63 N. W. 48, which is authority that a church of federated form of government may, after trial, remove a minister of one of its congregations in accordance with its general church laws. The action of the annual church conference at which the minister charged with the infraction of church discipline "was notified of the time of trial, and appeared before the court or investigating committee at the time appointed for the hearing, and took some part in the proceedings, read what in the evidence is stated to have been a protest against the action then taken, listened

to a small portion of the testimony, and then withdrew. The committee adjudged him guilty," which was duly approved and ratified by the conference. As he did not appeal from such decision expelling him from the ministry. It needs no comment to show this decision to be such and not an authority supporting the *ex parte* action of this synod. Bonacum v. Harrington, 65 Neb. 831, 91 N. W. 886, cited, is a decision sustaining the expulsion of a Roman Catholic priest from that church. Gaff v. Greer, 88 Ind. 122, 45 Am. Rep. 449, is also cited by respondents. This was a decision of a presbytery of the Presbyterian Church, wherein "the appellants had several times been before the presbytery, and had filed a written statement that had invoked the judgment under discussion." Counsel fail to discriminate between forms of church government in the citation of such authority. Same is true of State ex rel. Watson v. Farris, 45 Mo. 183, a standard authority on the conclusiveness of judgments of the general assembly of the Presbyterian Church, but it likewise has no application here. And certain language used in Smith v. Pedigo, 145 Ind. 361, 19 L.R.A. 433, 32 L.R.A. 838, 33 N. E. 777, 44 N. E. 363, would seem from a casual reading to support the reception in evidence of this synodical resolution, but what was there said was pure *obiter,* unnecessary to the decision, and an examination will disclose the decision was placed upon the fact that both litigants had submitted their controversy to the church tribunal having original jurisdiction, and later appealed, and again both participated. The defeated faction then sought to repudiate both decisions of the church tribunals. The comment relied upon by appellants, however, even under these circumstances, casts doubt upon the conclusiveness of even this double adjudication, where, as there, the form of church polity was congregational. But the parties were held bound as by a submission to arbitration. This case may be considered as an authority against the validity of the synod's action to the extent that it is questioned, instead of the contrary. Bouldin v. Alexander, 15 Wall. 131, 21 L. ed. 69, also cited, is not a holding even touching the admissibility of a resolution such as of this synod. There the church trustees were attempted to be ousted by the summary and void action of a mere minority of the congregation. The question arose whether such trustees had not withdrawn from their church, and placed themselves in the position of seceders. The holding determines

they were not, but still belonged to the congregation, and remarked that the fact that they had applied to the higher governing body of the Baptist Church for relief against the arbitrary conduct of the minority was some evidence that they considered themselves as still within the Baptist church in question. No decision of the higher body was either relied upon or upheld. Comment is only made upon the fact that they thus had appealed for protection, and had been recognized in so doing, as circumstances harmonizing with their conduct and tending to negative secession, the issue before the court.

This synodical resolution offered is clearly a self-serving declaration, as it is admitted the synod is much interested in the event of this action, the testimony of its president establishing the authorization of contributions from the congregations of the synod to assist in defraying the expense of plaintiffs. The resolution was inadmissible for any purpose.

Examination is now in order, of testimony on whether the particular doctrine of plenary inspiration, as distinguished from any and all other doctrines of biblical inspiration, was a part of the fundamental belief of this congregation at the time it was organized, in 1889, either as contained in the constitution or presupposed as a doctrine of the Lutheran Church of Iceland.

Rev. Olafson, plaintiff's first expert, testifies as follows: "By verbal inspiration of the Bible I understand the dictation theory to be meant, that the Bible had been dictated by God so that the men who wrote the Bible were as instruments, as a pen in a man's hand. The synod and the church by their confession and doctrines are not bound by that interpretation. The synod does not hold that view. Plenary inspiration of the Bible, as I understand it, is that God's Holy Spirit so guided and directed holy men in the writing of the Scripture that we have a true and correct account. . . . The delegates at the convention and the pastors at the convention who voted in favor of the Fridriksson resolution made a confession for themselves and also for the synod. . . . The Fridriksson resolution was in the nature of a reiteration of a confession of faith. It might be used as the expression of a man's faith, or the expression of a church of its position. . . . Under the constitution of the synod and the confessions of faith there is no specific declaration in favor of any particular inspiration theory. It

is simply an acceptance of the inspired word of God. The synod has gone on record as believing the Bible as stated in its confession. In this country there are over twenty denominations or divisions of the Lutheran Church, calling themselves Lutheran, and they have taken the Augsburg Confession and the Bible as their foundation.". About the Church of Iceland, the witness says: "The Seminingin, the synod organ, has charged the Bishop of Iceland with heresy, something to that effect. . . . The Church of Iceland is Lutheran in name at least, and is a state church. The Seminingin also took the position that the church organ of the Church of Iceland was an advocate of the new theology. That is the position of the Church of Iceland today. . . . The defendants in this case are undoubtedly in sympathy with many of the opinions of the Bishop of the Church of Iceland. I do not consider them good Lutherans. I would not consider the bishop a good Lutheran. The defendants with their views are not good Lutherans by any true Lutheran standard. They are as good Lutherans as the bishop of the church. The thing that marks the Lutheran Church as distinctly Lutheran is the confession of the church, and nowhere in the Augsburg Confession, or in any other confession of the Lutheran Church, is there a statement of any particular doctrine of inspiration. The whole Lutheran Confession is founded on that each Lutheran has the right to interpret the Bible as he chooses. . . . Luther's position was that he had the right, without the assistance of anyone else, to go to the Bible and interpret from it its doctrine, and he conceded that right to every individual. . . . The Church of Iceland and the synod have the same confession of faith, and the synod was organized originally for the sake of teaching on this continent the Lutheran doctrine according to the confession of the Church of Iceland. And the Church of Iceland, or at least a large number of the members of it, including the bishop, took the position that the religious consciousness of the individual had something to do or something to say about the acceptation and rejection of certain passages in the Bible. They take it that its confessions are merely what the framers of the confessions understood the Bible to teach, and state that the church, like any other organization, is bound to grow and develop, and if in the light of modern research the individual has come to the conclusion that some of the statements of the doctrine in the confession of faith con-

flict with the Bible, then he should follow the Bible, and not the confession of faith, and he would still be a good Lutheran. I have no reason to believe that the defendants in this case have gone a step further than the Bishop of the Church of Iceland and the dean of the theological seminary in Iceland and this other instructor. I have always stated that according to the teachings of the Church of Iceland as taught by the bishop, the defendants are good Lutherans. . . . The organizer of the synod, Bjaranson, received his theological training in the Church of Iceland. When the Icelandic Synod was organized, it was organized with Bjaranson as president." . . . The witness also testifies that in 1910 an invitation was extended by the synod to those who had left to rejoin the synod with certain specifications. The synod has gone on record since 1909 as not favoring verbal inspiration. The construction had been put on the action of the synod in 1909 that they had adopted verbal inspiration.

Plaintiff's next expert witness, Rev. Jonsson, testified on this subject: "Have been president of the synod since June, 1908, succeeding Rev. Bjaranson. The Icelandic Synod has no connection with the Church of Iceland, was organized in 1885, consists of several Icelandic Lutheran congregations in this country, thirty-five or forty churches belong to it now. . . . The synod decidedly holds to the plenary inspiration of the Holy Scripture as absolutely true in all particulars and in all matters is fully inspired. . . . The synod has declared that it adheres to the full inspiration of the Bible. . . . I agree with the definition of the plenary inspiration doctrine as given by Rev. Olafson. The synod has not anywhere gone on record in any manner as adhering to any particular theory of inspiration of the Bible. It has not done so by any constitution or in any of its confessions of faith, but it was the understanding of the synod. I do not know of any resolution prior to the Fridriksson resolution, in 1909, where a formal statement of this fact was made. I understand that resolution to mean that the synod rejects the right of the individual to elevate his religious conceptions over and above Holy Scripture. Anyone rejecting parts of the Scripture would be putting himself outside the pale of Lutheran Christianity. . . . There is no decree of the synod to the effect that anyone who refuses to accept every portion of the Bible becomes a heretic to the Lutheran faith. . . ."

Upon the foregoing testimony, together with the constitutions of the church and the synod, and the record of the synodical convention, and its resolution recognizing the minority as the Thingvalla Congregation, the plaintiffs rested their case, whereupon defendants moved for a dismissal because plaintiffs "have wholly failed to show any clear fundamental change of faith or departure from the confessions of faith by the defendants as evidenced by the constitution of the congregation and of the synod, or by any official declaration, or by document by either of these parties." And clearly the motion was well taken, and should have been granted. However, it was denied, and defendants submitted proof. It is noticeable that to this point not one word appears in either pleading or proof of the contention now advanced and found by the trial court, i. e., that these constitutions presupposed and were accepted under a presupposed belief in the plenary inspiration of the Scriptures. Defendants offered but little testimony, only two witnesses testifying to about five pages of printed record, of the hundreds of pages of evidence as finally introduced. Both sides rested the case, whereupon defendants renewed their motion for dismissal, which was again denied. An adjournment was then taken from March until October, during which interval a decision was rendered in favor of the defendants, but was subsequently set aside and the case reopened for the taking of further testimony at Grand Forks, the first hearing having been held at Pembina. Rev. Jonsson was then recalled for cross-examination. He testifies: "There is a theory of inspiration known as that of mechanical inspiration of the Bible." He was asked: "Is such a doctrine (the doctrine of mechanical inspiration of the Bible) recognized by the Lutheran denomination?" to which he answered: "Not as I understand mechanical inspiration. Mechanical inspiration is that theory of inspiration whereby it is held that the sacred authors in writing lost their personality and identity, became as mere instruments in the hand of God, so that they were as the pen in the hands of the writer, but their personal consciousness had nothing to do with what they produced. This theory is not the accepted theory or doctrine of inspiration of the Lutheran Church." Q. "Then you have already explained to the court the doctrine of plenary inspiration, I believe; and that is the doctrine that is held by the synod?" to which witness answered: A. "The synod has never adopted one theological term

officially in its confession. The terms, 'plenary,' 'verbal,' and 'dynamic,' are used, if I may explain, also in different senses by different teachers; and I think it is the definition of the inspiration doctrine, more than the name it is called by, that we in the synod lay stress on. . . . A man rejecting any part of the Scripture would not be considered a Lutheran." Under direct examination he testifies: "I don't know of any Lutheran church which adheres to the doctrine of mechanical inspiration as I define it on the stand. It has never been held by the Icelandic Synod of America, or by any congregation within that synod, to my knowledge. I can state positively that no Icelandic Lutheran congregation in America has adhered to such a doctrine, and I know of no Lutheran church which has for its confessional the Ecumenical Creed, the Augsburg Confession, and Luther's Catechism, that has ever adhered to the doctrine of partial inspiration of the Bible. Such a doctrine has never been recognized by the Icelandic Synod. The canonical books came down to the Lutheran Church as an inheritance. . . . The Missouri Lutheran Synod did at one time adhere to the doctrine of mechanical inspiration, but seemed to be changing." The views of the Missouri Synod are important for their historical bearing, this being the first Lutheran synod in Western America, although German, having a theological school. Counsel for appellants lay great importance on their claim that because the Icelandic Lutheran Synod of America had no theological seminary, many of its new pastors, young men succeeding the old ones, came from the Missouri Synod and general council imbued with less liberal views on the doctrine of inspiration of Scripture than ever prevailed in the parent church of Iceland. And that, through this cause, the synod had gradually departed from the faith of its fathers and founders, instead of any departure by the Thingvalla Congregation from such original faith.

Defendants then offered testimony on the charge of heresy, to the effect that, quoting from the testimony of witness Rev. Robertson, "the exercise of the right of private judgment is compatible with the doctrine of plenary inspiration of the Bible," assuming that form of inspiration to mean "the full and adequate inspiration of Scripture." Dr. Halfyard testifies: "As a theologian I see no conflict between the declaration that a man accepts the word of God as revealed in Holy

Writ as the supreme rule, and the further declaration of the right of private judgment in interpreting Scripture." Rev. Bergman, ordained a minister of the Icelandic Lutheran Church in 1886, and in continuous service of that church as a minister ever since with the exception of two years in work and in this synod, testifies to having been spokesman of that portion of the synod having parallel religious views to those of defendants, and was at the conference in 1909 and opposed the Fridriksson resolution. He testifies at great length and to the effect that the Lutheran Church of Iceland is not committed to the doctrine of plenary inspiration of the Scriptures. That inspiration of the Scriptures is presupposed, but "that is an entirely different thing from claiming that inspiration contains also the idea of *infallibility* or *inerrancy*." He says: "I would say that a man throwing away the inspiration of the Bible is an irreligious man. Inspiration of the Bible is impossible of definition. I do not know of any other man who has been able to define it. I never had any theory of inspiration. I believe in the inspiration of the Bible, and I believe that it is inspired, all of it so far as it contains religion. There are parts of the Bible that do not contain any religion, and I do not see any reason why I should say that these portions were inspired. They are like any old record, and I do not see any inspiration there. But there is inspiration all through the books of the Bible as far as the Bible preaches,—is the very breath of religion. I do not believe that all of the Bible is inspired. I do not believe, for instance, that some of the genealogies in the Book of Chronicles are inspired. I would not say that they were not written entirely without any inspiration or aid of the Holy Spirit. But I find no reason to connect them with the idea of inspiration at all. What I mean is this: That if I find that these genealogies are conflicting and untrustworthy I do not believe them any more because they are standing in the Bible than if they were standing in any other book. That is what I mean. I do not doubt the Bible as a whole. The most of the Bible, as I said, contains the very breath of religion, and that is with me the great proof of its inspiration. I know any man studying the Bible must have some opinion. But it is impossible to draw the limits where inspiration starts and where it ends. That is one reason that it is entirely impossible to define inspiration. Whenever something in the Bible appeals to your conscience as truth, then

29 N. D.—21.

you are sure that that is inspired. I determine that (inspiration) by its appeal to my conscience." This excerpt illustrates the claims of the defendants as to their doctrines on inspiration, as they are concededly in harmony with the views of this theologian. It is interesting that this witness considers that of the Old Testament, the Mosaic law "bears strongest witness of divine verity." The defendants then rested, and the plaintiffs put in their case as to inspiration on rebuttal.

The testimony of Professor Ness, an expert from the Lutheran Church of Norway, is offered by plaintiffs. Concerning inspiration this expert testifies: "The Lutheran Church does not, so far as I know, anywhere officially declare for any particular form of inspiration of the Bible. I think this quotation from vol. II, page 586 of the New International Encyclopedia . . . comes pretty near the truth (in stating): 'The Lutheran Church is a singular body in this, that none of its symbols either prescribe the canon of Holy Scripture or define inspiration.' I find that Scripture speaks of inspiration. I refer to what is stated in 2d Timothy, 3, 16, 'Through all or every Scripture, God breathed.' It is tacitly understood in my synod that the confessions of the church are binding. I do not know of any official declaration to this effect. It is leaning toward the plenary theory." The witness was allowed to express his opinion as an expert upon whether the adoption by resolution of the right of private judgment, as done by this congregation on the same day they withdrew from the synod, would constitute a departure "from the faith of any and all Lutheran churches having these confessional documents," and stated that it would be a departure from the faith. The fair conclusion from all of his testimony is, as he states, "The Lutheran Church is not committed to any particular form of inspiration of the Bible."

· Rev. Fossmark, a graduate of the Missouri Theological Seminary at St. Louis, testified in behalf of the plaintiffs, that "for many years the Norwegian Lutheran Church has accepted the theory of verbal inspiration," which form of inspiration witness defines to be "that God has not only inspired the thoughts contained in the Bible, but he has also guided these men whom he used as instruments to write the different books to such an extent that he has helped them to make the correct selection of words, so that every part of it is, by our denomination, considered to be the *word* of God; that not only the word of God is

contained in the Bible, but the Bible is the Word of God as a whole," and that his church opposed the so-called right of private judgment. That a congregation passing the resolution adopted by the majority on June 5, 1910, would not be admitted to the Norwegian Lutheran Church, and that the same would constitute a departure from the faith as the witness would interpret the meaning of § I. of art. 2 of the constitution of the Thingvalla Congregation, which the witness testifies to understand that it is thereby meant that the "Bible as a whole is the inspired word of God in its entirety." Witness, however, stated: "To-day there is a great difference between my church and the church of Norway as to the interpretation of some of the fundamentals of Lutheranism. Every one hundred years Christianity changes. The state of the church to-day in Norway is exceeding deplorable. I understand that the church of Norway is somewhat in the same deplorable condition as the church of Iceland, and the same sad truth is true of the church of Germany. It is here the humbug starts every time. Then it goes over to Norway, then to Denmark, and finally to Iceland, about twenty-five years afterwards. The position of the Methodist Episcopal Church of the United States is not, and never was, the same as that of my church with reference to the doctrine of inspiration. All reformed churches have as their guide their reason. They accept what they think is reasonable, and reject what they don't like. The Methodist Episcopal Church of the United States is afflicted with the same humbug as the Lutheran Church of Germany is on this point. You can go further, and even say that they are full-fledged Unitarians. Many of them reject the Deity of Christ. I would not say anything on this point as to the position of the Presbyterian Church in this country. I know it is the most Calvinistic of them all. This humbug is something that has been repeated and repeated once every century; it is nothing new." This witness does not express any opinion as to whether this "humbug" existed in the church of Iceland in 1889, or whether it, instead of the doctrine of plenary inspiration, might have been a fundamental doctrinal belief of Thingvalla Congregation when organized.

Witness Olafson was recalled, and testifies to practically the same as Professor Ness, adding, "there is nothing specific in the confession about inspiration, because the doctrine of inspiration was not in dispute

when the confessions were written, and for that reason it is taken for granted or presupposed, the presumption being based upon the understanding of the parties to the confessions, historically." All of these witnesses testify as to the different attitudes of Luther toward the Scriptures. But there is nothing in Rev. Olafson's testimony now given concerning inspiration, that conflicts with his testimony of many months before as a part of the main case, that "under the constitution of the synod and confessions of faith there is no specific declaration in favor of any particular inspiration theory. It is simply an acceptance of the inspired word of God." And the testimony of this witness, though called on rebuttal and with full knowledge of what was essential to establish that these defendants he terms as "dissenters and not Lutherans any more" had departed from the faith, failed to testify to or upon the crucial point, and by his testimony afford any specific evidence of the facts necessary to a deduction of such departure from the faith.

Rev. Walper, of the German Lutheran Church of the Missouri Synod was next called, and testifies to the belief of his church in the verbal inspiration doctrine. "I cannot say that the Lutheran Church the world over is in harmony of doctrinal matters with the position that Luther took in his latter years. Our synod is in harmony with that position. We have the same confessional documents in my church as in this church in question. The ministers of my church are bound to teach according to the confessions. The confessional documents say nothing explicitly about the doctrine of inspiration. The Lutheran Church construes the lack of any specific declaration of these documents as to the inspiration of the Bible to the effect that it was generally accepted, at the time these confessions were written, that the whole Bible was the inspired word of God, based on the presupposition that the prophets generally accepted by the church that the Old Testament, that with the prophets the Old Testament was closed; that the writings of the Apostles of Christ composed the New Testament, 2 Timothy, chap. 3, 16th verse, which says: 'Every Scripture is inspired of God' as meaning that all Scripture is inspired by God, verbal inspiration. That is the position taken by my church. So far as I know it is also taken by the Lutheran Church generally in this country." On cross-examination witness testified that he made no "distinction between the

verbal and plenary inspiration. It means that every word in the Bible is literally true. . . . So far as the results of philosophical and scientific inquiry of modern times are against the Bible in the sphere of geology, archæology, history, geography, biology, and astronomy, I repudiate them. In my judgment any man who believes in the verbal or plenary inspiration doctrine of the Bible must repudiate them." This testimony, offered for the purpose of establishing that the doctrine of plenary inspiration was the presupposed faith of the Lutheran Church of Iceland and of this particular congregation, falls far short of making proof for which it was offered. It may be that Lutheran churches in America generally take the position referred to, but it is no proof as to the position of the parent church mentioned in the constitution of this particular church congregation, nor proof of the position of this congregation on the matter, unless we do what the witness would not do, and construe his testimony as specific where he intends it to be general. Had this witness information that the Church of Iceland and that of this particular congregation adopted its constitution with no presupposed belief in plenary or verbal inspiration, still he could truthfully have testified exactly as he did, conceding the truth of all he has uttered.

Witness Glenn testifies on rebuttal for plaintiffs,—he is a member of the United Lutheran Church,—that "I do not know that our church has ever finally declared itself on any theory of inspiration, but the generally accepted theory, I believe, is what is commonly known as the plenary, but as some have stated the verbal, not the mechanical. . . . As far as I know there is no theory of inspiration given in these confessions (referring to the confessions of his particular church), I would say that the church takes inspiration for granted." He draws the conclusion from his interpretation of the constitution of the Thingvalla Congregation, that when they passed the resolution respecting the right of private judgment they departed from the faith of the congregation, though he admits that "I don't think that (the constitution) of the congregation refers to inspiration." That his conclusions are drawn from what the Lutheran Church concludes. But again is the proof lacking as to the original belief of the parent church and the particular one, on inspiration.

Plaintiff Gudmundson then testified to Rev. Bergman, defendants'

expert, having been the first pastor of Thingvalla Congregation, and remained its pastor for twelve or thirteen years, and that he taught, as witness understood him, "that all the Bible was God's inspired word." Witness does not attempt to be specific on the subject.

Rev. Thorlackson was called to testify to the belief of Rev. Bjaranson in 1889, and states: "I can't say what his inspiration theory was or is, but I can state that he believed in the word of God as revealed in the Bible, the true word of God in its entirety. I mean that he accepted the Bible and the whole of it and as fully inspired, as the word of God. I have held the same position, and that is the position he has been holding ever since I have been acquainted with him. I do not know that the synod has had any other position. . . . The reason that nothing is said of inspiration in the confessions is that the confessions are based on scriptural principles, adopted that the Holy Bible was the supreme authority of the confessions, rested upon the Holy Scripture, and was presupposed as being such. It is presupposed that all Scripture is the inspired word of God. This is based upon the testimony of the Scripture itself and of our Lord Himself. I refer to the passage in 2 Timothy, which has been quoted here. I construe it to mean that all the Scripture of the Old Testament canon are inspired. The phrase 'Word of God' is synonymous with 'Scripture,' and means the canonical books. I will say that the phrase of, 'Bible is the word of God,' and this 'the word of God as revealed in the canonical books of Scripture,' mean the same thing. I have understood it to be so accepted and taken by our church. I have been a pastor in the Icelandic Lutheran congregations in this country since I was ordained in 1887. I fully understood that the congregations which I have served at different times in this country have been obliged to conform to the confessional or doctrinal standards of the Church of Iceland as expressed in the confessions adopted by the Icelandic Church, as well as by the congregations that I have served in the synod to which I belong." Witness expressed his opinion that in passing the resolution of June 5 this congregation would not be acting in conformity with the doctrines of faith of the Lutheran churches having for their confessional documents the same as Thingvalla Congregation. On cross-examination witness testifies that the synod "was organized to teach the Lutheran Christianity taught at that time in Iceland and according

to the confessions and the Holy Scripture. . . . The people from Iceland, of course, would know how these confessional documents were interpreted in the Church of Iceland. . . . That it was the same Christianity taught. I am not aware of any disharmony at the present time between the Icelandic Lutheran Synod and the Norwegian Synod. I know that Rev. Bjaranson contended before our synod was organized that there were certain fundamental doctrinal differences between the Church of Iceland and the Norwegian Synod, and the difference was that the Norwegian Synod was not so liberal in doctrinal matters as the Church of Iceland; that he thought the Norwegian Synod was too orthodox; Rev. Bjaranson was very liberal in doctrinal matters when he first came to this country. There has been a change since those early days in the position of Bjaranson in the direction of becoming more spiritual, more faithful to the word of God and to the confessions of the Lutheran Church from my point of view. . . . I think that in this controversy with my brother he contended that he himself represented correctly the position of the Church of Iceland, and that my brother was the representative of the Norwegian Synod. I could not say whether there has been any material change in the Church of Iceland on the doctrine of inspiration since 1906, but I can say this, that liberalism in Iceland has been growing more and more as represented by Lutherans in Iceland, by the bishop and the professor at the university." On redirect examination, witness testifies: "As I have looked upon it, there is a difference in the Church of Iceland now on the doctrine of inspiration and its position on that point twenty-five years ago; liberalism has been growing. I would say that a great change has taken place on this point in the last ten or fifteen years principally." Rev. Jonsson was then recalled by the plaintiffs for the third time, and testifies that in 1885 Bjaranson, as witness understood him, "held very strictly to the full inspiration of all of the Bible," and the witness testifies to substantially the same as Rev. Thorlackson, that Bergman's "conception of inspiration as given in his testimony, as I understand it, is different from the accepted doctrine of inspiration, or inspiration as I have ever heard it presented by any theologian or know of its being presented by any theologians of the Lutheran Church. The mere declaration on the part of the individual to the effect that he entertains and believes in the right of private

judgment in religious things is not heresy. If a man in the exercise of that right rejects one of the canonical books of the Bible, for instance, he departs from the accepted standards."

Many pages are in evidence of articles from the Breidablik by Bergman, that reflect a disbelief of much of the miraculous contained in the Scriptures. There is also in evidence an article entitled, "Necessary Thought Awakener," published by Rev. Bjaranson in 1879, of fifty printed pages. Much of this is devoted to a defense of liberalism in his teachings as against the charge that he was promulgating "heretical innovations" in doctrine. He severely handles the German Theological Seminary of the Missouri Synod at St. Louis, stating that "the Missouri Synod is by far the most narrow-minded Lutheran synod that has hitherto appeared in the human race. If anything is breathed against the theology of this synod, it is as if the very heart of the Norwegian Synod had been touched," and the Norwegian Synod is by the reverend writer placed in the same class. Both are charged with "manufacturing dogma." "That as soon as the Lutheran Pope, Walther in St. Louis, speaks, the echo is immediately heard reverberating from every hill and elevation where the pastors of the Norwegian Synod live, and likewise, if silence reigns in the dogma factory of the Missouri Synod there is silence also in the synod." And many so-called "manufactured dogmas" are dealt with. In it we find the following: "Concerning the inspiration of the Bible, for example, not a single theologian of the Lutheran Church of the present day now teaches the same as the Missouri Synod has 'established,' and this one point is enough to make the Lutheran theologians outside of the Missouri Synod, and those synods which have become subjects to it, heretics" according to Missouri Synod standards. "The worst feature of the Norwegian Synod is perhaps not in the fact that it has copied from the Missouri Synod so many crooked and unhealthy doctrines and advocates them with so much vehemence and impetuosity, but the fact that it always obstinately maintains that it is planting here in America the unaltered doctrine of the Lutheran Church of Norway; and this in spite of the fact that it has received so many protests from the most eminent theologians, both among the pastors and university professors in Norway. . . . It is more than unfortunate that Icelanders should be led into the Norwegian Synod before they

become acquainted with other Lutheran synods in this country; but in order that that portion of the Icelanders which think and is intelligent need not in the future be led blindly into this synod, I have written this eye-opener. I consider it is my plain duty to show people into what they are going, who throw themselves into the arms of the Norwegian Synod." This is important as showing Bjaranson's trend of ideas back six years before organization of this synod, in 1886, on whether in fact the synod with him as its president adopted the doctrines of the Norwegian synods, condemned by Bjaranson. This but epitomizes the testimony consisting of 400 printed pages.

It is established beyond controversy, accepting the testimony of the experts at face, that there is no unanimity on the doctrine of inspiration among the Lutheran churches in America having similar constitutions and confessions; also that from the constitutions and confessional documents of this church and the parent church it cannot be said that any particular doctrine of inspiration was adopted by them. And all experts except those from the Missouri Synod recognize the right of private judgment, but disagree only on the extent to which that right may be invoked. Every expert admits that neither of these constitutional provisions has specific reference to or constitutes a declaration in favor of any particular inspiration theory. Resort is had to presupposition on that score. And in establishing presupposition as a foundation for alleged heresy, plaintiffs are met with the difficulty that their own experts do not stand on the same theory of inspiration. It must be kept in mind that it is not enough that any accepted doctrine of inspiration of Scripture be established or taken as a premise. There is a distinction between "full or adequate inspiration," "verbal," "mechanical," "dynamic," and "plenary inspiration" doctrines. Likewise, inspiration of the Scriptures "in its entirety" is insufficient to meet the measure here required, that it must be proven that these constitutions presupposed "plenary," not "verbal," "mechanical," "dynamic," "irradiant," "partial," or "personal" inspiration. Analysis of the testimony of the experts is interesting. Jonsson, president of the synod, repudiates both verbal and mechanical inspiration, and strikes the nail on the head when he testifies (as did Robertson also) that the terms definitive of different theories of inspiration and the term "inspiration" are used "in different senses by different teachers," and that

"it is the definition of the inspiration doctrine, more than the name it is called by," that is important.    Likewise, Bergman for the defendants agrees with plaintiffs that "inspiration of Scripture is presupposed," but adds:    "But that is an entirely different thing from claiming that inspiration contains the idea of *infallibility* or *inerrancy*," and asserts that a man throwing away "the inspiration of the Bible is an irreligious man."    Thus the alleged arch-heretic agrees with the president of the synod *that the Scriptures are inspired*.    "Inspiration," with reference to the Bible, is in a sense a relative term. It is only when some particular kind, degree, manner, or means, as here designated, "plenary inspiration" is asserted and claimed to have been a fundamental to this congregation's original belief, that particularity in the use of the term is called for.    And the experts but verify this conclusion when their testimony is scrutinized.    Repeatedly they testify that those Lutheran churches having the same constitution and creeds as this association would hold the defendants guilty of heresy to this Lutheran faith because of the resolution of June 5.    Yet when that expert is asked his particular theory of inspiration, which must necessarily be the yardstick used by him in determining such question of heresy, no unanimity is found in the measure, the viewpoint of the particular expert.    When the particular kinds of inspiration are thus called for and shown to be at variance one with the other, the conclusions of the experts as to whether the facts constitute heresy are accordingly rendered worthless and resolve into a failure of proof. Examine the specific belief of each of these reverend experts as to inspiration, the measure from which he determines heresy.    Notice, too, the different Lutheran churches and synods so represented to be speaking on the subject, but all denominated as Lutheran.    Only two, Olafson and Thorlackson, besides Jonsson, are from this Icelandic Synod. Professor Ness from the Norwegian Lutheran Synod agrees with Rev.'s. Olafson and Thorlackson to the extent that he will not say that he believes in plenary inspiration.    Olafson and Thorlackson content themselves with asserting that the Bible "in its entirety" is inspired, a generalization only when their testimony is considered to the effect that no particular form of inspiration is declared by the constitution of this church or this synod, or of the parent church of Iceland.    As close as Professor Ness will come to stating his views on inspiration is that his

own church (Norwegian Lutheran) is "leaning toward the plenary inspiration theory." Whether it is squarely upon that theory, or where it was twenty years ago with reference to plenary inspiration, he does not venture to assert. Rev. Fossmark has the same church, the Norwegian Lutheran, committed to "verbal" inspiration, meaning, as he has testified, that God selected the very words used throughout the entire Bible; a theory virtually as rigid as mechanical inspiration under which Deity wrote with the hand of man the Bible from cover to cover. Rev. Walper, of the German Lutheran Church and from the Missouri Synod, like Fossmark, who got his views from the German Theological Seminary in Missouri, also asserts his church to be grounded upon adherence to "verbal" inspiration. Both of these witnesses admit that the constitutions and creeds are blank on the question, but supplement them by 2 Timothy, chap. 3, verse 16, admittedly having reference only to the Old Testament. And here it may well be remarked that the difference between the belief of Ness and Olafson, both of whom repudiate verbal and mechanical inspiration and are ministers in the same church as Fossmark, who on the contrary declares verbal inspiration to be the theory of that same church, but well illustrates as it verifies also the fact contended for by appellants, that the Missouri Synod and General Council have narrowed the original liberal belief of the Norwegian and Icelandic Lutheran churches where it has come in contact with them, by training for the ministry the young pastors of the Icelandic and Norwegian Lutheran faiths. Thus the experts themselves have demonstrated unawares, from their very attitude on the doctrine of inspiration, that historically the probability is that the Icelandic Lutheran Synod has gradually become less liberal through the above influences than it was when founded. If anything can be said to be established, this must be so taken. Rev. Glenn, of the United Lutheran Church, repudiates mechanical, but has his church adopting both plenary and verbal. His testimony but well illustrates that even in theological circles the truth is, as plaintiffs' own expert Jonsson declares, that the terms are used in "different meanings by different teachers," that is, ministers. The inevitable result of all this is that, when the testimony is carefully studied, it is all in harmony with the conclusion that must inevitably be drawn, that no particular or specific theory of inspiration is enunciated by the con-

stitutions of either the church or the synod or the confessions of the Church of Iceland, all of which adopt and have always presupposed an adequate inspiration of the entire Bible. When seven experts called to establish *plenary* inspiration of the Bible to have been a fundamental doctrine of Lutheranism, and by inference this particular Church, demonstrate, as they have, the want of unanimity among Lutheran churches even of the same denomination, it is impossible to conclude that the Icelandic Lutheran Church believes in any particular presupposed doctrine of *plenary* inspiration; and this being true of the present, it cannot be inferred that it was any different twenty years ago. *Plenary* inspiration has been a topic for theological discussion since Luther's day. Vol. 5, Encyclopedia Britannica, 1914 ed. page 348B, subject, "Carlstadt," from which we quote: "In 1520 he (Carlstadt) still, however, maintained the doctrine of verbal inspiration and attacked Luther for rejecting the Epistle of James." See Nelson's Encyclopedia, vol. 6, page 451. And when the question of present departure from even the present alleged faith of the Icelandic Lutheran Synod is viewed from the standpoint of the expert and under his particular doctrine of inspiration, his conclusion that the defendants have departed from the faith amounts to naught as proof of the fact. In other words, that a believer in mechanical inspiration finds this church to be heretical to Icelandic Lutheranism means no more than that he would find the entire Icelandic Church heretical from his viewpoint of the inspiration doctrine. In fact one expert does not hesitate to assert this to be the fact, and includes all of the Protestant churches, except possibly the Presbyterian, in the classification as being virtually Unitarian. Each expert according to his particular idea of inspiration pronounces judgment, until the one having the least crystalized views on the subject of the specific kind of inspiration of the Bible, as classified in the evidence, does not hesitate to assert that the defendants are heretics, but in the same breath admits that they are no more so than the Bishop of the Icelandic Lutheran Church, the head of the state church of Iceland.

As judicial notice may be taken of authorities on the subject under discussion, reference may be made with propriety to certain deductions from the evidence drawn from an historical standpoint. It is well known that the state church of Iceland, as well as several other European

countries, is the Lutheran Church.   It is historically true that the documentary creed of a state church is usually broad, and often purposely indefinite except as to fundamentals of faith.   This is to enable all believers in religious fundamentals, but holding divergent views on degrees of orthodoxy, to nevertheless belong to and remain within the one state church.   This is well stated in Encyclopedia Britannica, 1914 ed. vol. 17, pages 141, 142, under the subject, "Lutherans," in discussing the European state churches of that faith.   We quote: "The divergences in ritual and organization, the principles underlying all the various ecclesiastical unions, *viz:* to combine two different confessions under one common government, and resulting from it the possibility of changing from one confession to another, have all combined to free the state churches from *any rigid interpretation of their theology formulas.*   A liberal and conservative theology (rationalistic and orthodox) exist side by side within the churches, and, while the latter clings to the theology of the 16th century, the former ventures to raise doubts about the truth of such a common and simple standard as the apostolic creeds."   This well explains historically that there was method in the admitted omissions of any reference to any particular doctrine of inspiration of the Bible in the written fundamentals of the Icelandic Lutheran Church.   Any supposition, as asserted by plaintiffs, that said church presupposed plenary inspiration as a fundamental belief, is probably contrary to fact, historically, especially when it is remembered that this subject of plenary inspiration was a live one at Luther's time.   Witness Walper was right in asserting that this doctrine is nothing new.   We quote with approval and as applicable the statement in the opinion in Bear v. Heasley, 98 Mich. 279, 24 L.R.A. 615, 57 N. W. 270, at page 280, with reference to the constitution and confessional documents of the Thingvalla Congregation and those of the Icelandic Lutheran Church:   "The creed was agreed to, not only by reason of what it expressed, but also because of what it omitted."   The findings challenged on this appeal are wholly unsupported by any competent evidence.   The judgment appealed from is accordingly ordered reversed, and this action dismissed.

FISK, J., concurring.   I fully concur in the views above expressed by Judge Goss, but I deem it proper to here briefly emphasize my per-

sonal views. The question is largely one of fact, involving primarily a construction of the constitution of the Thingvalla Congregation, which is the governing and controlling contract between these parties, and must measure their respective rights. Was it the intention of these contracting parties to adopt, and did they knowingly adopt and agree to, the doctrine of plenary inspiration of the Bible? It seems plain to me from this record that such question must be answered in the negative, and that the learned trial court's finding to the contrary is without support in the proof.

No one contends that such constitution or contract expressly stipulates in favor of the doctrine of plenary inspiration, for there is not the least foundation in such instrument for such contention, but it is contended, as I understand it, that such doctrine was "presupposed," or, in other words, inferred or implied. As I construe such instrument, however, there is no warrant for reading into it such implied or inferred stipulation or presupposed doctrine of faith; for it is or must, I think, be conceded that up to that time the Icelandic Lutheran Church had not adopted any definite doctrine or creed upon the subject. On the contrary, it affirmatively appears that the so-called mother church of Iceland professed and adhered to no such doctrine in its confessional documents, or otherwise. I am therefore inevitably forced to the conclusion that if the parties to this compact intended such a radical departure from the doctrines of the mother church they no doubt would have, in unmistakable language, so stipulated. This is but reasonable. They did not deem it necessary, however, to insert any express stipulation on so vital and important a matter, although matters of much more minor importance were carefully covered. The truth is, as I read and construe the record, that no particular doctrine of faith respecting the inspiration of the Bible was ever thought of by them, much less considered. They merely took it for granted that all accepted the doctrine of the inspiration of the Bible. In other words, it was "presupposed" that the Bible was inspired, but in what specific manner it was thus inspired did not, at that time, concern them. If it had, is it not reasonable to presume that they would have covered the subject by express stipulation? It is very apparent that when, some years later, the question arose as to the particular belief of the congregation respecting the doctrine of verbal, mechanical, or plenary inspiration of the Bible,

there was a very decided divergence of views, not only in such congregation, but in the synod as well, which disagreement resulted in a prompt disruption of both organizations.   Did such sudden divergence of views necessarily mean that the members of one faction or the other had departed from their views as previously entertained?   Clearly not, and if this be true, it serves as a most persuasive answer to the contention that the members of Thingvalla Congregation intentionally agreed, by the adoption of their constitution, to a doctrine of inspiration thus so emphatically and promptly repudiated by the majority after it was first brought to their notice.   While one person may suddenly change his views, even on so important a question as religion, it is contrary to all experience that a majority of a large church congregation would do so.   If the majority did not change their views, then they entertained such views at the date the congregation was organized, and it is difficult to believe, therefore, that they intentionally subscribed to and adopted a theory of inspiration contrary to their beliefs.   Furthermore, it is quite unnatural and improbable that the organizers of this congregation, who had emigrated so recently from their mother country, Iceland, and who did not do so on account of any difference in religious views, would intentionally depart from the views entertained and taught by the mother church.   From a careful consideration of the record, I am firmly impressed with the belief that there is no testimony showing that at the date Thingvalla Congregation was organized there was any definite and generally recognized doctrine or belief on the part of the Icelandic Lutheran Church, either in Iceland or America, respecting the different theories of inspiration of the Bible.   It was merely taken for granted, or, in other words, presupposed, that the Bible was the inspired word of God.   Further than this there was nothing taken for granted or presupposed.   How, then, can it be successfully contended that the minds of these parties ever met and agreed in their contract to the doctrine of *plenary* inspiration?

I am unable to discover any competent evidence in the record to warrant a finding that defendants departed from the faith of their . congregation.   Certain of plaintiffs' witnesses, such as Professor Ness, Rev. Fossmark, and Rev. Walper, it is true, gave it as their bald conclusions that the adoption of the resolution of June 5th constituted a departure from the faith of the congregation as promulgated by article

2 of the constitution. Such testimony is entitled to no weight, for it is wholly incompetent. It was the province of the court, and not these witnesses, to draw the proper conclusions from the facts. These witnesses clearly usurped functions belonging to the court. They might just as properly have given it as their conclusion that plaintiffs were entitled to win in this lawsuit. They should have been restricted to a statement of the facts, leaving the court to draw its own conclusions therefrom. This is an elementary rule of evidence.

Entertaining these views of the record, I feel constrained to differ from the findings and conclusions of the learned trial judge.

BRUCE, J., dissenting. I am unable to concur in the opinion of the majority of this court. The action was in the nature of the common-law action of ejectment, and though the case was tried to the court in the place of a jury, the findings of fact of that court must be given the same weight and effect as if they had been those of a jury. So, too, the question at issue is not, as stated in the majority opinion, whether the defendants have departed from the original Icelandic Lutheran faith, but whether or not they have departed from the original faith of the Thingvalla Congregation, and have violated its constitution. The decision involves an interpretation of that constitution, and ultimately and specifically an answer to the question as to whether or not by adopting the instrument the congregation, no matter what the original faith of Martin Luther or of the Icelandic Church might have been, accepted, as far as it was concerned, the Bible as fully and plenarily inspired, and made this belief a necessary and fundamental feature of its congregational faith. The questions presented are questions of fact, rather than of law, or, at the most, are mixed questions of law and of fact. Hale v. Everett, 53 N. H. 9, 16 Am. Rep. 82; Gibson v. Morris, 28 Tex. Civ. App. 555, 67 S. W. 433; Wiswell v. First Cong. Church, 14 Ohio St. 32; First Baptist Church v. Rouse, 21 Conn. 160. They are therefore for the jury, or for the court acting as a jury, and not for the court as a court, to pass upon. 38 Cyc. 1524; Mantz v. Maguire, 52 Mo. App. 136; School Dist. v. Lynch, 33 Conn. 330; Primm v. Haren, 27 Mo. 205; Young v. Stephens, 66 Mo. App. 222; Carp v. Queen Ins. Co. 104 Mo. App. 502, 79 S. W. 757; Bass v. Jacobs, 63 Mo. App. 393; M'Kean v. Wagenblast, 2 Grant, Cas. 462; Reynolds v. Richards,

14 Pa. 205. And if there is in the record competent evidence in support of the findings of the trial court, we are powerless to set aside these findings, even though there may be much, and perhaps equally conclusive, evidence in opposition thereto. The learned trial judge found "that the Thingvalla Congregation was organized in 1889 as a Lutheran congregation, adhering to the doctrine and tenets of faith embraced by that denomination; that the doctrine of plenary inspiration of the Bible was one of the fundamental doctrines of the faith of the Thingvalla Congregation at the time of its organization, and that the constitution of the Thingvalla Congregation at that time, and ever since, has presupposed and now presupposes that doctrine; that the defendants do not accept the doctrine of the plenary inspiration of the Bible, but at the time of the commencement of this action adhered to, and now do adhere to, a doctrine materially different, namely, that each individual may choose or reject portions of the Bible as inspired or as not inspired, and that the defendants have materially and fundamentally departed from the faith of the congregation which it held when organized in 1889, and which it has since held and now holds, and from the doctrines and tenets of faith of the said congregation as expressed in its constitution."

Though much of the testimony of the defendants is directed towards showing the position of the Church of Iceland and even of Martin Luther himself toward the doctrine of plenary inspiration, the real question to be determined is the attitude of the Thingvalla Congregation at the time of the adoption of its constitution in 1889, and whether at that time the congregation, and the synod to which it belonged, believed in the plenary doctrine, and considered a belief in it to be necessary and fundamental.

Though there is evidence to the contrary, there is much in support of the findings of the trial judge, and such being the case this court, which is sitting merely as an appellate tribunal, in a law case cannot interfere therewith.

Article 2 of the Constitution of the Thingvalla Congregation provided: "That the word of God as it is revealed in the canonical Scriptures is the true fountain and perfect law of the congregation in matters of doctrine, faith, and morals. 2. The congregation accepts the doctrines of Holy Scriptures in conformity with the Lutheran

29 N. D.—22.

Church in Iceland as expressed in its confessional documents.    3. The congregation shall be affiliated with the Lutheran Synod of Icelanders in this country, which accepts the same confession as the congregation."

In 1889, and two weeks after the adoption of this constitution, the Thingvalla Congregation joined the Evangelical Lutheran Synod of Icelanders in America, whose. constitution, among other things, provided that "the Synod believes that the Holy Scriptures, that is, the canonical books of the Old and New Testaments, are the revealed Word of God and the only true and reliable rule of belief, doctrine, and life of men.  .  .  .  Every Lutheran congregation of Icelanders in America, which desires to join the synod, must accept its constitution."

It was admitted by counsel for appellants on the oral argument, and there is certainly much evidence in support of the proposition, that the appellants do not adhere to the doctrine of plenary inspiration.    There is also much evidence in support of the proposition that both the constitutions of the synod and of the Thingvalla Congregation presupposed that belief.    Dr. Samuel F. Halfyard, for instance, though one of the witnesses for the appellants, positively stated that "the phrase that says that the canonical books are *the Word of God would imply the plenary theory of inspiration* or the canonical theory of inspiration, but not necessarily the theory of inspiration known as free inspiration, or, as has been stated here this afternoon, partial inspiration.  .  .  , *Speaking as a theologian, I would say that a man who makes the declaration first that the word of God as revealed in the canonical books is the supreme guide and rule, and then makes the declaration that he reserves the right to accept and reject in matters of Holy Scripture, is not asserting anything further than what is commonly known as the right of private judgment.*"    It is true that he afterwards intimated that in his opinion Martin Luther was himself a believer in the doctrine of free inspiration and in the right of the individual to the exercise of his own private judgment, but, as we before stated, the question is not what Martin Luther believed, but the meaning of the terms which were used in the constitution of the Evangelical Lutheran Synod of Icelanders and of the Thingvalla Congregation.

This, as we before stated, is the testimony of one of the experts for the defendants and appellants; and as we understand the testimony of Dr. Robertson, it is in the main to the same effect, though, of course,

both Dr. Halfyard and Dr. Robertson make it clear that they and the church which they represent (the Methodist Episcopal) do not believe in the doctrine of plenary inspiration. When we come to the testimony of the witnesses for plaintiffs, we find more positive testimony. It would be absurd, indeed, to contend that there is not abundant testimony in support of the findings of the trial court. These witnesses are Rev. K. K. Olafson, a former pastor of the Thingvalla Congregation; Rev. N. S. Thorlakson and Rev. Jonsson, vice president and president respectively of the Evangelical Lutheran Synod of Icelanders, Professor Ness of Concordia College in Moorhead, Minnesota, and a member of the United Norwegian Church; Rev. Walper, a member of the Missouri Synod, and Rev. Fossmark, a member of the Norwegian Synod. Of these witnesses, the Rev. Olafson, the Rev. Walper, and the Rev. Thorlakson testify that the technical meaning of the Word "Scripture" is synonymous with "the whole Bible," and that the expression the "Word of God" is synonymous with "the Word of God as it is revealed in the canonical Books of Scripture," *and means the Bible in its entirety.* On the main question of the meaning of the constitutional provisions in issue, the testimony of Professor Ness is similar to that of the other witnesses mentioned, and is in part as follows:

Q. Would a congregation which holds that certain parts of the canonical books of Scripture are not inspired, but untrue and unreliable, be in conformity with the standards, of faith of Thingvalla Congregation as set forth in its constitution?
A. No.
Q. Would you call it a departure from the faith of the congregation?
A. Yes.

The testimony of Rev. Mr. Fossmark, Lutheran minister of Grand Forks, reads in part as follows:
Q. In your opinion would a congregation in adopting such a resolution be acting in conformity with § 1 of article 2 of the constitution of Thingvalla Congregation, which reads as follows: "The Word of God as it is revealed in the canonical books of Scripture is the true

fountain and perfect law of the congregation in matters of doctrine, faith and morals?"

A. It would not.

Q. Would you consider such an action a departure from the faith of the congregation having this constitution?

A. Most certainly.

Q. State whether or not in your opinion this article of the constitution means that the canonical books of Scripture in their entirety are the supreme law and inspired Word of God?

A. Why, it means, in my opinion, that they look upon the Bible as a whole as the inspired word of God in its entirety.

Q. Would a congregation which holds that certain parts of the canonical books of Scripture are not inspired, but untrue and unreliable, be in conformity with the standards of faith of this congregation as it is prescribed by this article in its constitution?

A. It would not.

Rev. Mr. Walper, a Lutheran minister of Grand Forks, also testified on this point:

In my opinion a congregation adopting such a resolution (meaning defendants' resolution of June 5th), could not be acting in conformity with § 1 of article 2 of the constitution of Thingvalla Congregation. I would consider such action a departure from the faith of such congregation. Said article in the constitution means that the canonical books of Scripture in their entirety are the inspired Word of God.

In the testimony of Rev. L. O. Walper we find the following:

Q. Does your church permit an individual member to hold a view that certain portions of the Bible are uninspired, and still remain within the church as a member in good standing?

A. It does not permit that. A member of the church who took that position would be considered to have departed from the faith of the church. . . .

Q. Without reading to any extent from this M. Michelet's Life of Luther, I will just call your attention to certain passages. I refer now to page 272, where he quotes Luther as follows: "I candidly avow my ignorance as to whether I rightly understand the Psalms in their legiti-

mate sense. I do not, however, doubt the verisimilitude of my version of them. Amongst those who have rendered them, one has been in error in one part, and another has mistaken the meaning in another part. I discover meanings that were overlooked by St. Augustine; others who come after me will, I am aware, perceive much that has escaped me. Who will venture to affirm that anyone has thoroughly understood a single psalm? Our life is a beginning and a progress, not a consummation. He is best who approaches nearest to the spirit. There are degrees in life and in action; why should there not be the same in mind? The apostle declares that we are transformed from one light to a greater one." Respecting the New Testament Luther remarked: "The gospel of St. John is the true and pure gospel—the chief of the gospels—inasmuch as it contains the greatest portion of our Savior's sayings. Thus also the epistles of St. Paul and of St. Peter are higher in authority than the gospels of St. Matthew, St. Mark, and St. Luke. In a word, St. John's gospel and his first epistle, the epistles of St. Paul, more especially those to the Romans, the Galatians, and the Ephesians, together with the first epistle of St. Peter, constitute that portion of the New Testament which most clearly show Christ, and which contain and teach all that is useful and necessary to know, even were you never to see any other books." He did not consider the epistle to the Hebrews nor that of St. John to be of apostolic origin. He thus delivered his sentiments respecting that of St. Jude: "It is quite undeniable that this epistle is either an extract from or a copy of the second epistle general of St. Peter. The expressions are nearly identical in both. Jude speaks therein of the apostles as having been their disciples, and as writing after their decease. He quotes texts and mentions circumstances which are nowhere else to be found in the Scriptures." Luther's opinion respecting the Apocalypse is remarkable: "Let each man judge of this book according to the light that is in him and by his own particular perceptions. I do not desire to impose my opinion respecting it upon anyone. I say simply that which I think of it myself. I look upon the Revelations of St. John to be neither apostolic nor prophetic." On another occasion he said: "Many of the Fathers of the Church rejected this book; consequently every man is at liberty to treat it according to the dictates of his own mind. For my part, one single reason has determined me in the judgment I have

come to respecting it, which is that Christ is neither adored in it, nor is he therein taught such as we know him." These being claimed to be by the author as quotations from Luther's works, do you dissent from all this that I have read?

A. You must consider here that Luther was originally not a Lutheran in our sense of the word, but that Luther was originally a Catholic and a monk, and that through study of the Bible—Holy Scripture—he became enlightened, and that he was raised by the Catholic Church, and that he, more and more through studies of Holy Scriptures, became what he was in his latest years.

Q. You don't deny that these quotations are correctly taken from Luther's works, do you?

A. I do not deny it. I make no distinction between verbal and plenary inspiration. It means that every word in the Bible is literally true. For instance, that Eve was made out of a rib out of the side of Adam; that the world was created in six days of twenty-four hours each; in short, that every expression in the Bible relating to geography, geology, and biology is literally true, and also that it is historically true, and that if there is any astronomy in the Bible it is also true. That the sun actually stood still, for instance, at the command of Joshua, and so did the moon if it is mentioned there. If the plaintiffs in this case are members in good standing of the Icelandic Synod, and believe in plenary inspiration of the Bible, then in my judgment they are necessarily in harmony with my views that I have just now expressed, and if they are not, then they are not good Lutherans. Any man who disbelieves any of those things thereby immediately puts himself outside the pale of Lutheran Christianity. There is no word in the canonical books which I regard in any other light than the light I have thrown upon this subject now by my testimony. The holy authors were inspired by the Holy Spirit, and the Holy Spirit selected the vehicle for each thought. That doctrine does not go to the extent of the punctuation marks in the original manuscripts. There were no punctuation marks nor any vowels in the Greek,—there were in the original. In the old manuscripts there were no vowels and no divisions of syllables or words. The marks that were supplied in the sixth century were only put there to make it easier for foreign students of this language to study it. For instance, as originally written, you would have the letters

B R N, we will say; that might be barn or bairn, or anything else you could make out of it by putting vowels in. They put in the vowels in the sixth century. The scholars who put them in, were not, in my judgment, inspired by the Holy Ghost. These marks which they put in, which represent the vowels, are not inspired. The state church of Germany has taken an extremely advanced ground on this doctrinal matter. We have in our confessions the Formula of Concord and all the confessions that are contained in the Book of Concord. So far as the results of philosophical and scientific inquiry of modern times are against the Bible in the sphere of geology, archæology, history, geography, and biology, and astronomy, I repudiate them. In my judgment any man who believes in the verbal or plenary inspiration doctrine of the Bible must repudiate them. . . . . I should say that our church believes that the Holy Spirit used the individuality of the author as he wrote the words of Holy Writ. I believe that the words were suggested to the author by the Holy Spirit.

As I construe the evidence also, the majority were not merely content with repudiating the doctrine of plenary inspiration as applied to the particular words of the accepted books of the Bible, but repudiated whole passages, and to a large extent whole books. Dr. Bergman, for instance, who can be taken as expressing in a large measure the faith of the majority, stigmatizes as absurd a large number of the historical statements of the Old Testament. He says: "Now just this is characteristic of the literature of Israel, the Old Testament, that which contains any history in the proper sense; the writers of Israel did not write the history of their nation in the manner that history is written. They wrote homilies on national events, true and imaginary, but not history. They are much more concerned about the teaching than the history,— shape it and mould it as they see fit to support their doctrine." He then goes on to state that the story that King David prepared for the house of the Lord "an hundred thousand talents of silver and of brass and iron without weight, for it is in abundance" (see 1 Chronicles 22, 14), was an absurdity, as such an amount of money would be more than all the present national debt of Great Britain. In the same way he stigmatizes as absurd the recitals in Numbers, 2, 32, as well as those in the 7th chapter of Numbers, in regard to the amount

and number of sacrifices made in the desert. "When," he says, "a Jew in the exile wrote a homily (midrash) on the basis of some historical event, he did not intend that it should be history, but a pious meditation or sermon on a historical basis." On this basis he also seems to repudiate the story of Aaron and the Golden Calf (Exodus, 32). He states that "it is not necessary to think long about this story to realize how utterly far from all truth it must be. . . . This is too much for a thinking man to believe when he considers the separate features; for instance, the punishment."

In addition to all this I am of the opinion that the whole matter of doctrine has been adjudicated and decided by the Icelandic Evangelical Lutheran Synod of America, and that this court should follow this decision. The decision of the synod was that "it therefore seems apparent that the majority of the Thingvalla Congregation (meaning the defendants herein) has been guilty of a direct violation of its own constitution and of the constitution of the synod, and therefore it is right to allow the petition which the minority of said congregation has presented to this convention for determination, to wit: That the minority be recognized as the rightful Thingvalla Congregation."

This adjudication may not be final as a matter of law, or constitute *res judicata* in the strict sense of the term, but it is and should be persuasive evidence of the highest kind. When the church joined the synod, it expressly agreed "that the synod at its annual convention has the supreme power of decision in all disputes in church matters which may arise between or within its congregations." Article 2, constitution of the synod.

It also agreed to article 13 of the constitution of the synod, which provided that "every Lutheran Congregation of Icelanders in America which desires to join the synod must accept its constitution." It further agreed to article 3 of the constitution of the synod, which provided that "the synod believes that the Holy Scriptures, that is, the canonical books of the Old and New Testaments, are the revealed Word of God, and the only true and reliable rule of belief, doctrine, and life of man."

By joining the synod it accepted the doctrine of the synod, for article 2 of its own constitution expressly provided that "the congregation shall be affiliated with the Lutheran Synod of Icelanders in this country, which accepts the same confession as the congregation." It is

true that the action of the synod was not taken until on or about the 21st day of June, 1910, and was in the form of an adoption of the report of a committee of five which was appointed to sit upon the matter. It is also true that the majority faction of the Thingvalla Congregation had no representative at this meeting, and no definite notice of the appointment of the committee or of the hearing of the report. It is also true that prior to such meeting, and on or about the 6th day of June, 1910, such majority faction of the Thingvalla Congregation had notified the synod of its withdrawal. It is equally true, however, that the dispute arose long before any such withdrawal, and was the cause thereof, and that on or about the 9th day of June, 1910, the president of the synod sent the following notice to the defendants and appellants:

Mr. Olafur Olafson,
    Edinburgh, N. D.
Dear Sir:—I am in receipt of your letter of the 6th inst., together with a resolution of a meeting signed by Magnus Benjaminson, president, and Olafur Olafson, secretary. As a synodical convention will be held within a few days I am making no decision in the matter, but am referring it to the convention to be dealt with and disposed of. This I let you know in order that those who are concerned will have an opportunity to explain the matter to the convention if they so desire.

The evidence also shows that article 2 of the constitution of the synod provided that "the synod at its annual convention has the supreme power to decide all disputes in church matters which may arise between or within its congregations."

From all of this it is apparent that the proper tribunal to decide the doctrinal questions in controversy was the synod, and the fact that no member of the majority was present at the convention does not in any way weaken the evidentiary value of its decision. It is true that it was made a short time after the notice of withdrawal, but it was made while acting upon such notice and before the same had been accepted. The constitution of the synod expressly provided for the determination of such matters at such conventions, and, the withdrawal of the majority being based largely upon doctrinal differences, and the dispute having arisen while the church was a member of the synod, it seems hardly proper to hold that a body of people may enter

into a contract, provide for a tribunal which may determine questions arising thereunder, and then avoid the decision of that tribunal, after a breach of that contract, by withdrawing from its allegiance to that tribunal. We realize indeed that every tribunal must provide a hearing and a day in court, and that without such there is no due process of law. Due process of law, however, does not always involve a notification of the exact day or hour when a trial will be had; and when one knows that the matter will be considered in a meeting of a convention, and has an opportunity to send a delegate to that convention, the rules regarding due process of law would seem to be sufficiently complied with.

The matters of doctrine, indeed, which are before us, are such as should be determined by an ecclesiastical, and not by a civil, tribunal. The case before us is in the nature of an action of ejectment. Unless consent had been given that it should be tried by the court, it would have been submitted to a jury, and the absurdity and danger of submitting to an ordinary jury, or even to the ordinary judge, questions concerning theological differences, is too apparent to need amplification. We may accept the contention of counsel for appellants, "that the great weight of authority is to the effect that the jurisdiction of an ecclesiastical tribunal is subject to collateral attack," but even if this be the case, I find no fault with the exercise of that jurisdiction in the case at bar, and, provided that there was a day in court, which I think there was, I am ready to adopt and emphasize the well-known rules that "civil courts act upon the theory that the ecclesiastical courts are the best judges of merely ecclesiastical questions and all matters which concern doctrine and disciplines;" "and where a civil right or the right of property depends on some ecclesiastical matter such as doctrine, discipline, or church government, the civil court, where the question may arise, will take the ecclesiastical decisions out of which the civil right has arisen as it finds them, accepting those decisions as matters adjudicated by another jurisdiction." See 34 Cyc. 1184. I certainly adopt the general understanding of what are and what are not ecclesiastical questions, and that is: "An ecclesiastical matter is one that concerns doctrine, creed, or form of worship of the church, or the adoption and enforcement within a religious association of needful laws and regulations for the government of membership, and the

power of excluding from such associations those deemed unworthy of membership by the legally constituted authorities of the church." 34 Cyc. 1185. As I have said before, I believe there was the opportunity to be heard and the due process of law. I do not in all cases say that the courts will not inquire into the jurisdiction of an ecclesiastical body. I do however, say, except in the case of a palpable abuse of power, that "whether a case is regularly or irregularly before the assembly is a question that the assembly has the right to determine for itself, and no civil court will reverse, modify, or impair its action in a matter of purely ecclesiastical concern." State ex rel. Watson v. Farris, 45 Mo. 183; Shannon v. Frost, 3 B. Mon. 253; Gibson v. Armstrong, 7 B. Mon. 481; Mack v. Kime, 129 Ga. 1, 24 L.R.A.(N.S.) 675, 58 S. E. 184; Trinity M. E. Church v. Harris, 73 Conn. 216, 50 L.R.A. 636, 47 Atl. 116; Robertson v. Bullions, 9 Barb. 65.

It is not necessary for me, however, to take this position. Even if the action of the synod was not *res judicata,* it constituted evidence of the most persuasive kind. "But suppose we treat the action of the association as purely advisory, and not judicatory," says the supreme court of Indiana, in Smith v. Pedigo, 145 Ind. 361, 19 L.R.A. 433, 32 L.R.A. 838, 33 N. E. 777, 44 N. E. 363, "still its action must have a controlling influence on the civil courts." Again, the Supreme Court of the United States, in Bouldin v. Alexander, 15 Wall. 131, 21 L. ed. 69, a case in some of its aspects much like the one at bar, said: "They claim to be the Third Colored Baptist Church, and as such they were recognized by councils of Baptist churches duly called, and by the Philadelphia Baptist Association, an ecclesiastical body with which the church was associated. That body, it is true, was not a judicatory. Its action was not conclusive of any rights. But the fact that the complainants, and those acting with them, applied for recognition as the Third Colored Baptist Church, and that the association thus recognized them, is persuasive evidence that they were not seceders, and that their rights have not been forfeited."

The record, indeed, discloses that the question under consideration here was twice passed upon by the synod, and there can be and is no claim or pretense that on the first occasion at any rate the plaintiffs and the Thingvalla Congregation generally were not members of that synod. This was on the occasion of the passage of the so-called Frid-

riksson resolution, in June, 1909, which construed the constitution of the synod, and defined the position of the synod and of its membership or congregations upon the question here in controversy, the same provision being in the constitutions of both the synod and of the Thingvalla Congregation. It is true that after the passage of this resolution the delegates of the Thingvalla Congregation withdrew from the convention in a body, but they were present at the time of the introduction and passage of the same, and participated in the discussion and action thereon, and there is no pretense that the *congregation,* as a congregation, withdrew from the synod, or that even the delegates themselves withdrew from the synod as a synod, until long after the schism in the Thingvalla Congregation and the withdrawal of the plaintiffs, that is to say, until June 5th, 1910. The so-called Fridriksson resolution was as follows: "The convention declares that the views which the synod's organ, Sameinigin, has advocated during the past year, are the correct position of the synod, and protests against the attacks on those views which have appeared within the synod by Rev. F. J. Bergman in his periodical, Breidablik. And in consequence of these attacks, the convention makes the following resolution: 1. The convention denies that the confessions of the synod are merely advisory, and not binding, as has been contended by Rev. F. J. Bergman in Breidablik. Confessions are binding until they are repealed. 2. The convention denies that the clergymen of the synod have the right to teach whatever they please, even though they can say that they are teaching according to their best conscience and convictions. They do not have the right to teach within the synod anything which conflicts with what they have bound themselves to teach as pastors of the synod. 3. The convention *denies* that the religious consciousness of the *individual* has the *power of decision over Holy Scripture and may reject its statements at pleasure,* and the conclusion which follows from this, that the Bible is an unreliable book. On the other hand, the convention declares that it adheres to the confession of the synod that the entire Scriptures are the Word of God, reliable and inspired, and that everything in it ought to be judged according to the standard of the Bible itself."

Added to the evidence afforded by the resolution of the synod is the testimony of a number of prominent divines who testify in support of the findings of the trial court and of the contention of the respondents.

In addition to this is the testimony of Sigurbjorn Gudmundson, who testified that he was one of the organizers of the congregation and a member of the committee which drafted the constitution, and that the intention of the framers of the constitution, when they drafted § 1 of article 2 thereof, was "that the congregation must accept the Bible and the whole thereof as the supreme law and inspired Word of God, and that it could not reject any part or parts of Scripture as not inspired." This testimony, I believe, was competent.    34 Cyc. 1157; Robertson v. Bullions, 11 N. Y. 243.

I cannot, in the face of all this evidence, say that the findings and judgment of the trial court are not supported by competent and persuasive evidence, and, being unable to make such findings, I am of the opinion that the judgment of the trial court should be sustained. The whole matter, indeed, resolves itself around an interpretation of article 3 of the constitution of the synod, and ¶¶ 1 and 2 of article 2 of the Thingvalla Congregation, which at no time seem to have been amended; and which some witnesses at least construe to imply the doctrine of plenary inspiration.   Much, it is true, is said by counsel of certain of the other provisions and amendments which recognize the confessional documents of the Icelandic and Lutheran churches, but in them is no reference to the question of the inspiration of the Scriptures, or the doctrines of plenary or free or partial inspiration, but merely to the cardinal questions of the Trinity and of the Godhead. The reference, in short, to these documents, in no way affects the scope and application of articles 2 and 3 of the respective constitutions.

I find no merit in appellants' contention that the amended complaint stated no cause of action as it failed to properly allege what the particular tenets were from which the defendants had departed, wherein that departure consisted, and that plaintiffs themselves had adhered to these tenets.   If, indeed, the complaint was lacking in anything, it was in definiteness and particularity, and the objection should have been raised by a motion before the trial, rather than by a motion to exclude any and all evidence after the trial had begun.   We have held in a number of cases that a complaint will be most liberally construed on a motion to exclude all evidence thereunder, and such a rule is not only in conformity with the spirit of the Code as I see it, but with the holdings of the authorities also.   "We cannot," says Judge Cooley,

in the case of Bauman v. Bean, 57 Mich. 1, 23 N. W. 451, "sanction· the practice of pleading to the merits, and then raising at the trial an objection in the nature of a demurrer. It is every way an inconvenient practice, and it tends to make litigation unnecessarily expensive. If a declaration fails altogether to set out a substantial cause of action, and is incapable of being made good by amendment, the objection may be taken in any stage of the proceedings; but even then, for very obvious reasons of convenience, the questions of sufficiency ought to be disposed of before parties are put to the expense of preparation for trial. But if the objections to the declaration are not necessarily fatal, the defendant has no claim to the indulgence of a hearing upon them at the trial."

There is no merit in appellants' contention that plaintiffs and respondents failed to specifically allege the incorporation of the defendants. The incorporation was specifically alleged in the answer, and admitted upon the trial by the defendants. This I believe cured any omission that there might have been in the complaint. Omlie v. O'-Toole, 16 N. D. 126, 112 N. W. 677; 31 Cyc. 714; Rogers v. Penobscot, 28 S. D. 72, 132 N. W. 792, Ann. Cas. 1914A, 1184; Sheibley v. Huse, 75 Neb. 811, 106 N. W. 1028, 13 Ann. Cas. 376.

Nor is there any merit in appellants' ingenious argument that the majority of the congregation, by incorporating themselves after the secession, incorporated the minority, as the constitution provided for a rule by the majority. The controversy is over the church property, and the church property alone. It is admitted that the incorporation was not perfected until August 12, 1910, while it was on June 5th that the majority withdrew from the synod, and specifically declared their renunciation or dissent from the doctrine of plenary inspiration. All the acts of secession, therefore, if secession there was, had been committed before the incorporation, and if these acts amounted to a secession, which the trial court was, I believe, justified in holding,. the property became vested in the plaintiffs under article 1 of the constitution, which provided that "if a division occurs in the congregation, the property shall belong to such portion as adheres to this constitution." This, indeed, would have been the rule, even if there had been no constitutional provision. It seems, indeed, to be well established that "the separation or secession of part of the members from a church

does not destroy the identity of the church, or lessen the right of those adhering to the organization, but members seceding from a church thereby forfeit all right to the church property, and the courts, when called upon, will award the property, and all rights pertaining thereto, to those who continue to adhere to the doctrine, tenets, and rules of the church as they existed before the division, or, in case it is a denominational church, to those recognized by the highest judicatory of the denomination as being the church or congregation." 34 Cyc. 1167; Venable v. Coffman, 2 W. Va. 310; Nance v. Busby, 91 Tenn. 303, 15 L.R.A. 801, 18 S. W. 874; Watson v. Jones, 13 Wall. 679, 20 L. ed. 666; Smith v. Pedigo, 145 Ind. 361, 19 L.R.A. 433, 32 L.R.A. 838, 33 N. E. 777, 44 N. E. 363; Krecker v. Shirey, 163 Pa. 534, 29 L.R.A. 476, 30 Atl. 440; Mt. Zion Baptist Church v. Whitmore, 83 Iowa, 138, 13 L.R.A. 198, 49 N. W. 81.

I am not unmindful of the cases of Fadness v. Braunborg, 73 Wis. 257, 41 N. W. 84; Holm v. Holm, 81 Wis. 374, 51 N. W. 579; West Koshkonong Congregation v. Ottesen, 80 Wis. 62, 49 N. W. 24; 24 Am. & Eng. Enc. Law, 361, 362 and cases cited; 34 Cyc. 1196, and cases cited in note 13; Gewin v. Mt. Pilgrim Baptist Church, 166 Ala. 345, 139 Am. St. Rep. 41, 51 So. 947; Happy v. Morton, 33 Ill. 398; State v. First Catholic Church, 88 Neb. 2, 128 N. W. 657; 34 Cyc. 1157, and cases cited in note 5 and page 1158, note entitled "Possession of Corporation Presumed." Dubs v. Egli, 167 Ill. 514, 47 N. E. 766 at page 768; Klix v. Polish Roman Catholic St. Stanislaus Parish, 137 Mo. App. 347, 118 S. W. 1171; 24 Am. & Eng. Enc. Law, 329–330 and cases cited; Calkins v. Cheney, 92 Ill. 463; Horst v. Traudt, 43 Colo. 445, 96 Pac. 259; Wilson v. Livingstone, 99 Mich. 594, 58 N. W. 646. In none of these cases, however, was there a constitutional provision such as in the case at bar, nor was the incorporation had after the secession and without the consent or connivance of the regular or remaining congregation.

I am of the opinion that the judgment of the district court should be affirmed.

SPALDING, Ch. J. dissenting. While concurring fully in the opinion of Judge Bruce, I desire to add a word showing as succinctly as pos-

sible my conclusions reached after spending some weeks on the record and authorities.

Judges of the different civil courts are not elected with reference to their qualifications as theologians or theological experts. They are not presumed to be, and in fact are not recognized as, such. They are elected because of certain other real or imaginary qualifications. On the other hand, ministers of the gospel, who have spent years or their entire lives in the study of theological questions, the consideration of the doctrines of their own and other denominations, are particularly qualified to pass upon such questions. For this reason civil courts of a country in which church and state are separate uniformly decline to determine theological controversies within a church, when they have been passed upon by the supreme judicature of such church.

The question in this case, the answer to which ought to control this court, is, Has the supreme judicature of the denomination to which the Thingvalla Congregation voluntarily attached and subjected itself passed upon the doctrinal meaning of the Thingvalla constitution and the constitution of the Synod of the Icelandic Lutheran Church in America? If it has, its decision, whatever it was, is binding upon this court. It matters not whether any representative of the Thingvalla Congregation was before the judicature. If not, the least weight that could be attached to the decision of the synod would be, as found by the trial court, that it was entitled to great weight as evidence. If the Thingvalla Congregation was represented, or was a component part of the synod, the decision is conclusive. It is unquestioned that at the time of the adoption of the Fridriksson resolution the Thingvalla Congregation was a member of the synod, was represented in the synod, and participated in the consideration of the questions involved. The decision having been adverse to them, they should not now be heard to question its binding character.

Certain other points may be referred to. I think the basic fallacy of the opinion written by my brother Goss consists in his assumption that the synod must have jurisdiction over the person, so to speak, of the Thingvalla Congregation when it passes upon a theological question, in order to make it controlling in the case of such congregation. The synod had power under its constitution to determine doctrinal questions. That was the only jurisdiction necessary for it to possess,

and all coming within the supremacy or dominion of the synod were concluded by that decision until it should be overruled or reversed by the body which made it.

The right of private interpretation as a term is plainly misapplied. It does not mean the right to reject any or all of the Bible. It means the right to give to any portion, or the whole of the Scriptures, such meaning as appeals to the intelligence and conscience of the reader, all the time assuming it to be Scripture.

Neither is it necessary that the contention of the respondents in this case be proved by the evidence, or established by the record. The evidence is conflicting as to the fact as understood by different theologians, but there is ample evidence to sustain the findings of the trial court, even if such opinions were necessary in the face of the decision of the synod. The synod has construed and interpreted the language of the constitutions. It had authority to do so. It is not for this court to inquire into the mental processes employed, or the evidence on which the synod based its decision. It is sufficient that it came to a decision. We are required only to inquire what that decision was, and then give it such force and effect as may be necessary to determine the right to the ownership and possession of the church property. I apprehend that no member of this court, if expressing his own views, would concur with those of the minority of the Thingvalla Congregation, or of the majority of the synod, on the question of inspiration; I certainly should not; but be that as it may we are confronted with the duty of deciding this lawsuit on the record before us, and not on our personal beliefs.

Referring to the concurring opinion of my brother Fisk: In reply to his statement that no one contends that the constitution of the Thingvalla Congregation stipulates in favor of the doctrine of plenary inspiration, my understanding is that the testimony of several witnesses, experts, is to the effect that the language of the constitution implies plenary inspiration, though it does not use the word "inspiration" or the word "inspired." From their testimony I judge that the terms used have generally been construed by theologians to mean that the Scriptures were wholly inspired. Not only that, but in the employment of this language its authors proceeded on the assumption that it was conceded by all that Scriptures were plenarily inspired, and that there-

fore it was unnecessary to make specific mention of that fact. It was not assumed that it would ever be questioned, and in fact Judge Fisk concedes this when he says: "They merely took it for granted that all accepted the doctrine of inspiration of the Bible. In other words, it was presupposed that the Bible was inspired." But when he continues by saying that "in what specific manner it was inspired did not at that time concern them," he injects into the case an irrelevant and immaterial question. The controversy was far more vital than a quibble over the manner of inspiration. The question was whether all Scripture was inspired, and if it was, then the doctrine of the appellants, to the effect that whole books might be rejected if their contents did not find favor in the judgment and conscience of the reader, was in conflict with the constitutions. My understanding is that when one believes in either verbal or mechanical inspiration he believes in plenary inspiration, but that inspiration may be plenary without being either verbal or mechanical.

I, however, do not consider it very material whether any doctrine of inspiration was considered or thought of when the congregation adopted its constitution. When it joined the synod it agreed to abide by the interpretation placed upon the constitutions of both the synod and the congregation by agreeing to submit all doctrinal questions to it for decision, and even had it contemplated any specific kind of inspiration when the constitution was framed, language was used which left room for growth and expansion. It likewise left room for contraction and narrowing by interpretation. But however the conclusion of the synod may be regarded, it constituted its decision on a doctrinal question, and when it is said that it was taken for granted or presupposed that the Bible was the inspired word of God, the full contention of the respondents is sustained, because such is plenary inspiration. Surely the doctrine contained in the last paragraph of Judge Fisk's opinion is most novel, and would exclude all opinion evidence by experts.